**Danny Ray HARRIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69366.

Court of Criminal Appeals of Texas, En Banc.

June 28, 1989.

Rehearing Denied March 28, 1990.

Bill Turner, Dist. Atty., and Deena J. McConnell, Asst. Dist. Atty., Bryan, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DUNCAN, Judge.

The appellant was convicted of capital murder pursuant to V.T.C.A. Penal Code, § 19.03(a)(b), and punishment was assessed at death under Article 37.071(e), V.A.C. C.P., after the jury answered affirmatively the questions submitted by the trial court at the punishment phase of the trial. This is the second time this Court has reviewed a death sentence imposed on the appellant for this offense. See *Harris v. State,* 645 S.W.2d 447 (Tex.Cr.App.1983).

Since the facts in this case have not changed, we will take the liberty of adopting the comprehensive factual recitation as set out in the appellant's previous appeal, *Harris v. State, id.,* at 454.[1] To do otherwise would unnecessarily and reduntantly lengthen this opinion.

Briefly, however, the appellant, his codefendant, James Charles Manuel, and appellant's brother Curtis Paul Harris, were all indicted for the capital murder of Timothy Merka. Valerie Rencher, who was a juvenile at the time of the offense and the apparent girlfriend of Curtis Paul Harris, although present at the time of the offense, was never formally charged by indictment. Further, as a result of a plea agreement, she testified for the State against the appellant at both of his trials.[2]

The appellant's first point of error is based on the trial court's refusal to grant a new trial after it was discovered that a portion of the record had been lost. In his second point of error, the appellant claims that the trial court did not have the jurisdiction to take remedial measures in an

John D. MacDonald, II, New Caney, for appellant.

---

1. If new or additional facts were developed at appellant's subsequent trial which is the basis of this review, we will so note when necessary.

2. The essential portions of the plea agreement between the prosecution and Rencher provided that in the event she was convicted for any offense arising out of the transaction which was the basis of the indictment of the others in this cause she would not be assessed a punishment greater than 10 years in the Texas Department of Corrections.

effort to correct the defect in the record. Since both points of error are so interrelated they will be disposed of simultaneously. On June 15, 1984, a pretrial hearing was conducted by the trial court. Apparently because the regular court reporter was unavailable, Brazos County authorities arranged for an independent court reporter to report the hearing. The record demonstrates that the appellant's attorney requested that the court reporter take notes of the hearing. Later, and in a timely manner, appellant's counsel requested in his Designation of the Record that the notes of the pretrial hearing be made a part of the record. Sometime after the Designation of the Record had been filed, the appellant and the State were advised that the notes of the pretrial hearing were lost.

Appellant's counsel then filed his Objection to the Record specifically identifying the deficiency in the record and requested a hearing on his Objection to the Record and "after [the] hearing enter such orders as may be appropriate to cause the record to speak the truth...."

Two hearings were held to examine the appellant's Objection to the Record; however, only the second hearing is consequential. At that hearing, one of the appellant's trial attorney's conceded no witnesses appeared at the pretrial hearing and that the only matters that transpired at the pretrial hearing was "we heard all the motions;" "[t]here were rulings by the court;" and "[t]here were agreements that were dictated into the record between the counsel as to what would be provided and what wouldn't." Further, the witness agreed with the prosecutor that the court made docket entries reflecting his rulings on the motions and in "almost every case ..." the court's rulings were noted on the motions themselves. At the conclusion of the hearing on the Objection to the Record, the State tendered to the court "a rough draft which has a list of all the, I believe, twenty-six motions that were heard on that day." The court ordered that the tendered document (which was not introduced into evidence and thus not a part of this record) be formalized and returned to the court.

On January 16, 1987, the trial court conducted a hearing to consider supplementing the record with a document that identifies the pretrial motions heard by the court on June 15, 1984, and the court's ruling on the motions. At this hearing the trial court, over the appellant's request for a "mistrial" (new trial), ordered that the record be supplemented with the document that recounted the pretrial hearing and concluded that including that document in the record the record in the appeal was complete.

■ Prior to examining the substance of the appellant's claim it is imperative to examine whether the Rules of Appellate Procedure are applicable to the appeal of this conviction. As noted at the outset of the opinion, this is the appellant's second time before this Court for the same offense; thus, this case has been around for a long time. This time the appellant was convicted and assessed the death penalty on July 29, 1984. Therefore, the appellant's appeal proceeded in accordance with the procedures dictated by Article 44.01, et seq., V.A.C.C.P. Specifically, when the matter of the objectionable record surfaced the appellant's counsel responded pursuant to the procedures required under Article 44.09(7), *supra*. That is, on July 22, 1986, he filed his Objection to the Record and requested a hearing thereon. On August 1, 1986, the court held its first hearing on the appellant's Objection to the Record. Thus, the process of responding to the appellant's complaint about the record proceeded in accordance with the then still applicable procedures mandated in the Code of Criminal Procedure.

On September 1, 1986, the Texas Rules of Appellate Procedure became effective pursuant to an order of this Court adopting such rules dated December 18, 1985. On September 22, 1986, this Court, recognizing that confusion existed as to the applicability of the rules to appeals that were in the process of being perfected, issued an Order Implementing the Texas Rules of Appellate Procedure in Criminal Cases. In relevant part this Order provided as follows:

It is Ordered by the Court of Criminal Appeals that as to posttrial, appellate and review procedures and steps completed or required to have been completed prior to September 1, 1986, the procedural provisions then in effect shall govern.

It is further Ordered that all procedural matters and requirements as to posttrial, appellate and review procedures and steps completed or required to have been completed on or after September 1, 1986, shall be governed by the procedural requirements of the Texas Rules of Appellate Procedure in criminal cases, regardless of when notice of appeal was given.

As previously noted, the appellant's appeal was initiated pursuant to the procedures then required by the Code of Criminal Procedure. Specifically, relevant to this point of error, notice that the record had been completed was given to the appellant on July 8, 1986. The appellant objected to the record on July 22, 1986 and, as previously noted, the initial hearing on his objection was held on August 1, 1986. Under then Article 40.09(7), V.A.C.C.P., once notice that the record was complete a defendant had fifteen days to file his Objections to the Record. Thus, the appellant had to file his Objections to the Record by July 23, 1986. He properly and timely filed the objection on July 22, 1986. Thus, the time period necessary for the appellant to preserve his Objection to the Record and his preservation of the objection were dates prior to September 1, 1986. Since the appellate procedures appropriate to preserve his Objection to the Record were "completed or required to have been completed prior to September 1, 1986 . . . ," then the appellate procedures noted in Chapter 40, V.A.C.C.P., were applicable to this appeal.

We certainly recognize that other proceedings, necessary to perfect this appeal, occurred after September 1, 1986. It would be absurd, however, to require an appeal to be perfected under one standard and then arbitrarily apply another standard. Therefore, as to this appeal, we find that the provisions of the Code of Criminal Procedure rather than the Rules of Appellate Procedure are applicable.

■ Dispensing with this preliminary procedural matter, the appellant claims that the loss of the notes of the pretrial hearing dooms his conviction. The appellant relies principally upon *Dunn v. State,* 733 S.W.2d 212 (Tex.Cr.App.1987). In *Dunn, id.,* the Court stated:

It has long been the rule in this State that "[w]hen an appellant, through no fault of his own or his counsel's, is deprived of a part of the statement of facts which he diligently requested, the appellate court cannot affirm the conviction. *Austell v. State,* 638 S.W.2d 888, 890 (Tex.Cr.App.1982). See also *Gamble v. State,* 590 S.W.2d 507 (Tex.Cr.App.1979); *Timmons, supra,* at 512; *Pierson v. State,* 147 Tex.Cr.R. 15, 177 S.W.2d 975, 976 (1944); *Navarro v. State,* 141 Tex. Cr.R. 196, 147 S.W.2d 1081, 1085 (1941) (Opinion on motion for rehearing); and now also Tex.R.App.Pro.Rules 210(a) and 50(e). Further, this rule has been applied whether all or only a portion of the statement of facts was omitted. See *Austell, supra* (voir dire examination); *Gamble, supra* (final arguments during guilt and punishment before the jury); and, *Hartgraves v. State,* 374 S.W.2d 888, 890 (Tex.Cr.App.1964) (hearing on motion for new trial).

[T]he burden is on appellant to establish that he ha[s] been deprived of his statement of facts. [citations omitted] To be entitled to a reversal of judgment of conviction where the statement of facts is not filed, an appellant must show due diligence in requesting it and that failure to file or to have the statement of facts timely filed is not in any way due to negligence, laches, or other fault of the appellant or his counsel. [citations omitted] Indeed, the circumstances in such cases should be viewed from the appellant's standpoint, [citations omitted] and any reasonable doubt is resolved in favor of the appellant. *Timmons [v. State], supra,* [586 S.W.2d 509] at 512 [1979]. See also *Gamble, supra,* at 508.

Based on the above quotation it would appear conclusive that once an appellant

demonstrates that he requested the court reporter to take notes of the trial or any part thereof, that the court reporter was requested to transcribe the notes and include such transcription in the record on appeal and the court reporter's failure to do so was appropriately objected to, then a conviction must be reversed.

■ However, *Dunn v. State, id.*, and the cases cited therein are substantively and procedurally distinguishable from the present case. In *Dunn, id.*, the missing portions of the record consisted of the evidentiary hearing on thirty-seven pretrial motions, a part of the voir dire of a prospective juror and the entire testimony of a witness at the punishment stage of the trial.

In the cases cited in *Dunn, id.*, the missing portions of the record were either the entire statement of facts, the final argument, or an essential portion of the trial. In the case at bar, the missing portion of the record is a transcription of the notes of a pretrial hearing that are not essential or even applicable to a resolution of this appeal.

The other aspect of this case which renders *Dunn, id.*, and the precedents it cites inapplicable is that the trial court was able to substitute for the missing notes a "supplemental transcript" that details the essence of the pretrial hearing. Specifically, the supplemental transcript identifies the appellant's pretrial motions that were filed and the court's rulings on the motions.

Article 40.09(7), V.A.C.C.P., authorizes the trial judge, when confronted with an objection, after a hearing, to "enter such orders as may be appropriate to cause the record to speak the truth...." *Id.* In fact, this is the relief the appellant requested in his written Objection to the Record.

In addition to Article 40.09(7), supra, Article 44.11, V.A.C.C.P., provided as follows:

In cases where the record or any portion thereof is lost or destroyed it may be substituted in the trial court and when so substituted the record may be prepared and transmitted to the ... Court of Criminal Appeals.

Recourse to this statute was not utilized in *Dunn, id.*, or in any case cited in *Dunn, id.* In the present case, however, the court substituted for the notes a written statement reflecting the pretrial proceeding.

In *James v. State*, 138 S.W. 408 (Tex.Cr. App.1911), following his conviction for unlawfully carrying a pistol, the defendant filed a motion in arrest of judgment claiming that no information had been filed. Controverting the defendant's motion, the State asserted that an information had been filed, provided the court with five affidavits attesting that an information had been filed and lost, and requested permission to enter into the record a substitute information. The trial court entered an order substituting the information. The Court of Criminal Appeals, citing Article 470, *Code Cr.Pro.* 1895, a predecessor statute to Article 44.11, supra, concluded that the trial judge had the authority to make such a substitution.

Some twenty-three years later, utilizing a statute that succeeded Art. 470, *Code Cr. Pro.* 1895, Art. 828, *Code Cr.Pro.* 1925, this Court again approved of a similar substitution. In *Fine v. State*, 125 Tex.Crim. 337, 68 S.W.2d 192 (App.1934), the Court observed that "[t]he charge of the court included in the original transcript contains no affirmative instruction to acquit appellant if the jury entertained a reasonable doubt as to whether ...," *id.*, at 194, the defendant was guilty. When confronted with an objection to the record that identified this deficiency, the trial court, after a hearing, concluded that such a charge had been given to the jury and that it had been lost and substituted a similar charge in the record as a supplemental transcript.

At that time Art. 828, supra, provided in part that "after notice of appeal has been given, the record or any portion thereof, is lost or destroyed, it may be substituted in the lower court, if said court be then in session...." *Id.* Relying upon this statute the Court of Criminal Appeals concluded that the statute expressly "authorize[s] the substitution of a record notwithstanding the loss occurred after the trial began and prior to the giving of notice of appeal."

*Id.,* at 195. Further, and significantly, the Court also stated:

> Appellant's next contention is that the charge as substituted must be in the exact language of the lost charge. We think this position is untenable. In the absence of copies of the record, it would, in most cases, be impossible to substitute the record in its exact language. We think the law requires no more than that the charge be substantially the same as the instruction shown to be lost.

*Id.*

The Court concluded that the charge in the record was substantially the same as that given the jury and accordingly affirmed the appellant's conviction.

Much more recently, in *Broussard v. State,* 471 S.W.2d 48 (Tex.Cr.App.1971), the Court again approved the substitution of a lost portion of a record. After the defendant had been convicted and punishment assessed, the State pointed out to the trial court that the original indictment had been lost. In response, the trial court issued an order declaring that the original indictment had been lost or misplaced and ordered that another be substituted for it in the record. The only difference between the two indictments, according to the court's order, was that the substituted indictment did not contain the signature of the grand jury foreman. On appeal, the defendant in *Broussard* contended that the appellate record did not contain either "an indictment nor a legally substituted copy of the indictment...." *Id.,* at 49.

Recognizing the applicability of both Article 40.09(7), supra, and Article 44.11, supra, this Court rejected the appellant's contention that the record was incomplete.

The Court stated: "[u]nder 44.11, the trial court may make substitutions for lost or destroyed documents, and under 40.09, Sec. 7, his findings, if supported by evidence at the hearing, are final." *Id.,* at 50.

In the present case, after two hearings, the trial court approved a supplemental transcript that details the matters that were examined and resolved at the pretrial hearing. The appellant does not dispute the factual validity of the supplemental transcript. Since the trial court has the responsibility of making "the record ... speak the truth....," Article 40.09(7), supra. Article 44.11, supra, consistently allows the trial court to make a substitution for a lost portion of the record to accomplish such responsibility. In this case, the trial judge properly utilized the procedures available to him. Accordingly, appellant's points of error one and two are denied.

■ Appellant next challenges the sufficiency of the evidence to support the jury's affirmative findings under Article 37.071(b)(1) and (b)(2), V.A.C.C.P.[3] In determining the sufficiency of the evidence as to the first special issue dealing specifically with the appellant's conduct and whether his conduct was committed deliberately and with a reasonable expectation that the deceased or another would die, we apply the standard set out in *Santana v. State,* 714 S.W.2d 1, 7 (Tex.Cr.App.1986):

> [T]he evidence must be reviewed in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Article 37.071(b)(1), V.A.C.C.P., to have been proved beyond a reasonable doubt. *Wil-*

---

**3.** Article 37.071, V.A.C.C.P., provides in relevant part:
> " * * *
> (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury.
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
> (2) whether there is a probability that the defendant would commit criminal acts of vio-

> lence that would constitute a continuing threat to society;
> * * * * * *
> The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted.
> * * * * * *
> (e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death.

*son v. State*, 654 S.W.2d 465 (Tex.Cr. App.1983). Then we must determine whether the same evidence supports an inference other than that appellant's conduct contributed to causing the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result. If it does, a trier of fact could not reasonably find 'yes' on special issue number one, and the punishment must be reformed to life imprisonment. *Green v. State*, 682 S.W.2d 271, 288 (Tex. Cr.App.1984).

Being aware that we look solely to the evidence reflecting the appellant's conduct without considering the law of parties, *Nichols v. State*, 754 S.W.2d 185 (Tex.Cr. App.1988), and viewing this evidence in the light most favorable to the jury's verdict, we find the evidence was sufficient to establish beyond a reasonable doubt that the appellant's conduct contributed to causing the death of the deceased, Timothy Merka, and was committed by the appellant deliberately with the reasonable expectation that the deceased's death would result. In making its decision the jury was entitled to consider all of the evidence submitted during the guilt-innocence phase of the trial. *Santana v. State, supra*, at 8; *Green v. State, supra* at 287; *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979); *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978). Although the testimony reveals that appellant's brother was the individual who actually struck the blows that proved to be terminal for Merka, evidence of appellant's participation and his responsibility for the murder is clear and supports the jury's finding of appellant's individual "deliberateness" beyond a reasonable doubt.

The evidence shows that on the evening of December 11, 1978, driving a vehicle apparently stolen by his codefendant, James Charles Manuel, appellant and Manuel picked up appellant's brother, Curtis Paul Harris and his girlfriend, Valerie Rencher. The foursome then drove from Bryan to Sandy Point Road, in an attempt to locate appellant's girlfriend. Just prior to reaching their destination, the appellant's vehicle ran off the road, struck a sign post, and crashed into a fence. Following the wreck the parties continued their search for Harris' girlfriend. They failed to locate Harris' girlfriend. At some point the appellant's car stalled and would not start. Appellant, Manuel and Harris then launched into a crazed attack upon the vehicle cursing it, ripping the interior, breaking a window, and inflicting various other damage on it.

Apparently hearing the parties' concentrated attack on their uncooperative car, a man came out onto the porch of a nearby house. Appellant requested the use of battery booster cables, but the man did not have any at that location. Appellant then commented to the others, "Twelve miles is a long way to walk," [4] and they began to walk along Sandy Point Road. When they later saw the lights of an approaching pickup truck appellant said he was going to ask the driver for a boost. Appellant then stood in the road in front of the on-coming pickup truck and flagged down the driver, requesting help to get their crippled vehicle started. Tim Merka stopped, and to comply with their request, positioned his truck nose-to-nose with the appellant's vehicle in order to properly use the battery booster cables.

Becoming frustrated after watching appellant and his friends unsuccessfully trying to start the car for about 20 to 30 minutes, the deceased suggested that the foursome get assistance from someone else down the road. It was at this point that the appellant devised the plan to murder Merka in order to steal his pickup truck for the ride back to Bryan. According to Valerie Rencher, the appellant approached codefendant, James Manuel, and discussed something with him. She then heard Manuel reply, "Man, my arm is still out of place." Rencher then overheard appellant whisper to his brother, "We're going to

---

**4.** Referring to the origin of the destination, Bryan, Texas, where all members of the four-

drive this man." [5] While the deceased was unhooking his booster cables from the two vehicles, appellant approached him, pushed the deceased in the chest, and when Merka fell on his back appellant sat on his chest and pinned his arms down by holding his wrists. Curtis Paul Harris then approached, holding what appeared to be a jack, and while the deceased was apparently begging for his life, hit the deceased repeatedly in the head until they concluded that he was dead. The pockets of the deceased were then ransacked, his wallet taken and the pickup truck stolen as the four headed back to Bryan and the Harris residence. On the ride back to Bryan, appellant in a cavalier manner told Rencher, "if it was the man time to die, it was just the man time to die [sic]."

Notwithstanding that the appellant was not the one who physically dealt the blows to the victim, he knowingly and actively participated in the vicious attack. In addition, the evidence dictates the conclusion. that the appellant was indeed the instigator. For example, appellant not only approached Manuel to enlist his services in the attack, but when that was unsuccessful he was able to encourage his brother to assist. Further, he pushed Merka to the ground and pinned him there while his brother administered an exceptionally brutal beating, even after the victim plead for his life, telling appellant and his cohorts to take what they wanted but just spare him his life. After the beating had concluded, the appellant, once inside the Merka vehicle, demonstrated that he desired the death of his victim by the callous and cruel comment to the effect that it was just Merka's time to die. Surely, under these circumstances appellant's conduct not only intentionally caused the death of Merka, but "from beginning to end evince[d] 'deliberateness' under article 37.071(b)(1)."

*Green, id.,* at 289. This point of error is overruled.

■ Appellant's challenge to the sufficiency of the evidence to support the jury's affirmative answer to special issue number two is also without merit. As we have said on numerous occasions "[i]n some cases the circumstances of the offense can alone sustain an affirmative answer to the second issue, Art. 37.071(b)(2)." *Green, id.,* at 289; *O'Bryan, supra; Duffy, supra.* The circumstances of this case warrants such a finding. As previously noted, the appellant willingly participated in the offense with the evidence demonstrating that he planned the robbery with the intent to kill Merka in order to avoid having to walk back to Bryan. In fact, his entire attitude before, after and during the offense showed complete contempt for the sanctity of human life. In addition, the State at the punishment phase offered evidence that appellant had been previously convicted of a felony offense and that his reputation for being a law-abiding and peaceable citizen was bad. Coupled with the unadjudicated offenses introduced into evidence, the State effectively substantiated that appellant consistently engaged in a pattern of violent conduct that posed a danger to society. The evidence, viewed in a light most favorable to the verdict, is therefore sufficient for the jury to have found that there is a probability that appellant would commit acts of violence that would constitute a continuing threat to society. Accordingly, this point of error is overruled.

■ Appellant next contends that the trial court committed reversible error when it failed to instruct the jury at the guilt-innocence stage of the proceedings that Valerie Rencher was an accomplice as a matter of law. Rather, the jury was submitted an instruction requiring them to determine whether Rencher was an accomplice as a matter of fact.[6] Appellant both timely ob-

some resided.

5. Rencher explained, that the phase, "drive this man," meant rob the person.

6. The trial court instructed the jury as follows:
 You are further instructed that a conviction cannot be had upon the testimony of an ac-

complice unless the jury first believes that the accomplice's evidence is true and that it shows that the defendant is guilty of the offense charged him, and even then you cannot convict unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense

jected to the charge and submitted a special requested instruction which were overruled by the trial court.

As noted, the trial court instructed the jury to decide the fact question as to whether Rencher was an accomplice, but the appellant claims that the evidence demonstrated that she was an accomplice as a matter of law; therefore, according to the appellant, the jury should not have been given the opportunity of making this determination. In the appellant's first appeal, *Harris v. State, supra,* we reversed the appellant's conviction when we concluded that the trial court erred in failing to submit to the jury the question of whether Rencher was an accomplice, but that the evidence did not show that Rencher was indicted for the murder for which appellant was on trial, so as to make her an accomplice as a matter of law. *Harris v. State, supra,* at 454. "Under the doctrine of 'the law of the case,' where determinations as to questions of law have already been made on a prior appeal to a court of the last resort, those determinations will be held to govern the case throughout all of its subsequent stages, including a retrial and a subsequent appeal."[7] *Granviel v. State,* 723 S.W.2d 141, 147 (Tex.Cr.App.1986). See

*Ware v. State,* 736 S.W.2d 700 (Tex.Cr.App. 1987); *Ex parte Calvin,* 689 S.W.2d 460 (Tex.Cr.App.1985); *Willis v. State,* 479 S.W.2d 303 (Tex.Cr.App.1972). This issue having been previously decided adversely to him, appellant's point of error is overruled. *Harris v. State,* supra, at 454.

■ In a matter related to the previous point of error, the appellant had requested that a special issue be submitted to the jury asking them to answer whether or not they found Rencher an accomplice, this request was also denied by the trial court.[8] Appellant's claim that the court's ruling was in error is without merit. Not only did the accomplice witness instruction properly and adequately protect appellant, but Article 37.07, § 1(a), V.A.C.C.P., provides that "[T]he verdict in every criminal action shall be general." Thus, as was stated in *Stewart v. State,* 686 S.W.2d 118, 124 (Tex.Cr. App.1984), "[o]ther than the provisions in Article 37.071, V.A.C.C.P., Texas jurisprudence has no authority allowing the submission of special issues to a jury in a criminal case." This is not to say that a special issue could never be constitutionally necessary despite the statutory prohibition

charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.

Now, if you believe from the evidence that the witness, Valerie Denise Rencher, was an accomplice, or you have a reasonable doubt whether she was or not, as the term 'accomplice' is defined in the foregoing instructions, you are further instructed that you cannot find the defendant, DANNY RAY HARRIS, guilty of the offense charged against him upon Valerie Denise Rencher's testimony unless you first believe that said testimony is true, and that it shows the defendant is guilty as charged in the indictment and even then you cannot convict the defendant unless you further believe that there is other evidence in the case outside of the evidence of the said Valerie Denise Rencher tending to show first, that the defendant, DANNY RAY HARRIS, at the time Curtis Harris struck the deceased on the head with a hard metal object, if he did, was acting together with Curtis Harris, if he did, and was in the course of committing the offense of robbery of Timothy Michael Merka, and second, that DANNY RAY HARRIS, acting together with Curtis Harris, if he did, at the time Curtis Harris struck the deceased on

the head with a hard metal object, if he did, had the specific intent to kill Timothy Michael Merka, and even then, before you can convict the defendant, DANNY RAY HARRIS, you must believe from all the evidence, beyond a reasonable doubt, that the defendant, DANNY RAY HARRIS, is guilty of the offense charged.

7. We observe that in the case *sub judice* no evidence was introduced to show that from the time appellant's first trial ended until the commencement of the second, Valerie Rencher had been indicted as a codefendant. See *Bentley v. State,* 520 S.W.2d 390 (Tex.Cr.App.1975); *Hendricks v. State,* 508 S.W.2d 633 (Tex.Cr.App. 1974); *Allen v. State,* 461 S.W.2d 622 (Tex.Cr. App.1970); *Gonzales v. State,* 441 S.W.2d 539 (Tex.Cr.App.1969).

8. Appellant submitted a special request that the jury at the guilt or innocence phase be instructed as follows:

Do you find from the evidence, beyond a reasonable doubt, that the witness Valerie Denise Rencher was not an accomplice as defined above if any offense was committed?
Answer "we do" or "we do not"
Answer: _____

of Article 37.07, § 1(a), *supra.* In this case, however, the trial court was correct in denying appellant's request.

■ In appellant's next four related points of error, it is his contention that the trial court impermissibly granted the State's challenge for cause and excused venirepersons Mojie Burgoyne, Thomas Edwin Lawler, Aubrey Jean Cleveland, and Jeanne Marie Smith in violation of the requirements as set out in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1981); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

The Supreme Court made it clear in *Wainwright v. Witt, supra,* "that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment," is "whether the juror's view would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions [as given by the trial court] and oath.'" *Wainwright v. Witt, id.,* at 424, 105 S.Ct. at 852. See also *Ex parte Williams,* 748 S.W.2d 461 (Tex.Cr.App.1988); *Ex parte Hughes,* 728 S.W.2d 372 (Tex.Cr.App.1987). Relative to the four prospective jurors in this cause we find no need to detail or quote the voir dire of each venireperson as it would only unduly and unnecessarily add to the length of this opinion without contributing to the jurisprudence of this State.

It is sufficient to observe that as to each venireperson the trial court, prosecutor, and the defense attorney thoroughly explained the statutory scheme envisioned by Article 37.071, *supra,* and each venireperson acknowledged an understanding of the process. In essence, the four venirepersons responding to the queries posited that they, under no circumstances, could cast an affirmative vote to both special issues which may be submitted to them at the punishment phase of the trial so as to trigger the automatic assessment of the death penalty by the trial court. Further, they stated that if necessary they would consciously distort their answers to the special issues in order to prevent the imposition of the death penalty. The record clearly demonstrates that as to Mojie A. Burgoyne, Thomas Edwin Lawler, Aubrey Jean Cleveland and Jeanne Marie Smith, a constitutionally acceptable basis existed to support the trial court's conclusion that the venireperson's conscientious scruples towards the death penalty would affect them "to such a degree and to such an extent that [their] performance as a juror would be substantially impaired." *Ex parte Williams, supra,* at 464. Accordingly, these points of error are overruled.

■ Appellant next claims that the trial court erred when it sustained the *State's* challenge for cause as to venireperson Karen Leah Lockhart, after she unequivocally stated in response to a hypothetical question that if an accused was convicted of the lesser included offense of murder, she could not consider probation at the punishment phase of the trial. Defense counsel interposed the objection that Lockhart's view did not express a total and unequivocal inability to consider the minimum punishment for the lesser included offense of murder and that he should be given the opportunity to rehabilitate the prospective juror. In response, the trial court allowed the defense to continue questioning Lockhart with Lockhart reiterating her previous position. At the conclusion of his voir dire examination, the appellant did not lodge any additional objections.

In his appellate brief, for the first time, appellant claims that Lockhart's exclusion denied him a jury which was fair and impartial on the subject of the death penalty, and tenuously attempts to assert the proposition that he was entitled to a juror who could not consider the minimum range of punishment. We need not reach the merits of appellant's contention. It is sufficient to point out that appellant's objection to the trial court's action in sustaining the State's challenge for cause is totally different from the point of error he presents to this Court for the first time. The appellant's point of error simply does not comport with his trial objection and hence he did not preserve for appeal the issue which he now

seeks us to review. We therefore overrule his tenth point of error. See *Garcia v. State*, 626 S.W.2d 46, 56 (Tex.Cr.App.1981).

In point of error number eleven, the appellant contends that the trial court erred in failing to sustain his challenge for cause as to venireperson Edna L. Thornton. Converse to the usual mode of voir dire proceedings, the appellant sought to challenge Thornton on the basis of Article 35.16(c)(2), *supra*, in that she stated in no uncertain terms that the State should have a greater burden of proof than that of beyond a reasonable doubt in a capital case.[9] Appellant's argument is that he was entitled to have a juror capable of applying the appropriate burden of proof at all phases of the trial.

■ In *Payton v. State*, 572 S.W.2d 677 (Tex.Cr.App.1978), this Court summarized the requirements necessary to preserve error due to the trial court's denial of a defense challenge for cause of a prospective juror:

> [W]hen the issue concerns denial of a challenge for cause or exclusion of a qualified venireman, only the examination of the individual venireman need be in the record. The harm may be shown in the denial of challenge for cause by showing exhaustion of the defendant's peremptory challenges, denial of a request for additional peremptory challenges, and the seating of a juror upon whom the defendant would have exercised peremptory challenge....

*Id.*, at 680.

Thus, in order to warrant a reversal by this Court for the trial court's erroneous denial of an appellant's valid challenge for cause it must be demonstrated that:

1. The voir dire of the individual venireperson was recorded and transcribed.
2. The appellant at trial asserted a clear and specific challenge for cause clearly articulating the grounds therefore.
3. After the challenge for cause is denied by the trial court, appellant uses a peremptory challenge on that juror.
4. All peremptory challenges are exhausted.
5. When all peremptory challenges have been exhausted, appellant makes a request for additional peremptory challenges.
6. Finally, the defendant must assert that an objectionable juror sat on the case. The appellant should point out to the trial court that he is being forced to try the case with a juror seated whom he would have exercised a peremptory challenge had he had one.

■ In this case, although appellant in his brief maintains that all of the peremptory challenges to which he was entitled under Article 35.15(a), V.A.C.C.P., were exhausted, the record indicates to the contrary. Reviewing the entire voir dire,[10] the record unequivocally demonstrates that after the selection of the first twelve jurors and prior to the selection of the alternate juror, appellant had not exhausted all of his fifteen peremptory challenges. In fact, during the process of selecting the one alternate juror, appellant made an attempt to exercise one of his remaining peremptory challenges which the trial court correctly prevented him from doing in accordance with the dictates of Article 35.15(d).[11] Fail-

---

9. The relevant portion of Article 35.16 provides:
 (c) A challenge for cause may be made by the defense for any of the following reasons:
 \* \* \* \* \* \*
 2. That he [venireperson] has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which he is being prosecuted or as a mitigation thereof or of the punishment therefor.

10. It is only appropriate to observe that this record, when it was received and filed in this Court, was, to be kind, simply a mess. For example, the volumes of the statement of facts were not numbered properly, some volumes were apparently missing, and there was not even a list of the jurors that heard the case. It was only after the record was returned to the trial court that steps were taken to correct the problem. Trial courts, the State and the defense bar should note that this Court is not favorably disposed to correct errors in the preparation of the record.

11. Article 35.15(d), supra, reads:
 The State and the defendant shall each be entitled to one peremptory challenge in addition to those otherwise allowed by law if one

ing to exhaust all of his peremptory challenges, appellant did not comply with the fourth step necessary to preserve error. Moreover and understandably, the appellant neither claimed in the trial court nor before this Court that he was compelled to try this case with a jury composed of at least one individual who he would have struck with a peremptory challenge had one been available to him. That being the case, any error which may have been committed by the trial court in denying appellant's challenge for cause was not properly preserved for review. Accordingly, appellant's eleventh point of error is overruled.

In points of error twelve and thirteen, appellant alleges that the trial court committed reversible error in failing to sustain his challenges for cause as to venirepersons Judith Lewis and Linda Smith. Appellant claims that venireperson Lewis demonstrated a bias toward the law applicable to the case when she stated she could not consider probation if the accused was convicted of the lesser offense of murder. Smith, according to the appellant, indicated that if the appellant was convicted of the lesser included offense of murder she would require him to present evidence before she could consider probation. The appellant expended a peremptory challenge as to each prospective juror. As previously noted, the appellant was infirm in preserving this error as it was not asserted that he was forced to accept an objectionable juror. Consequently, these points of error are therefore overruled.

■ In appellant's fourteenth point of error he complains that the trial court failed to comply with the requirements of Article 35.17(2), V.A.C.C.P., and this constitutes reversible error. Article 35.17(2), *supra*, provides as follows:

> or two alternate jurors are to be impaneled and to peremptory challenges if three or four alternate jurors are to be impaneled. *The additional peremptory challenges provided by this subsection may be used against an alternate juror only, and the other peremptory challenges allowed by law may not be used against an alternate juror.* [Emphasis added]

In a capital felony case, the court shall propound to the entire panel of prospective jurors questions concerning principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court.

Appellant is correct in his assertion that the trial court failed to comply with the statute's dictates; however, we find under the circumstances of this case that the error was harmless under Rule 81(b)(2), *Tex.R.App.Pro.*[12] It is evident from the record that each prospective juror who ultimately served as a juror was questioned by either the trial court, prosecutor, and defense attorney as to the matters encompassed by the statute. Further, it is clear that each juror understood these principles. In addition, the trial court properly charged the jury on the standard and burden of proof, the presumption of innocence, and on the prohibition of using the return of an indictment as a circumstance of guilt against the accused. Furthermore, the record is totally devoid of any evidence which would indicate that any juror seated in this case could not or did not comprehend the basic principles of law identified in Article 35.17, *supra*. Granted, it is statutorily required that the trial court propound the questions and instruct the jurors on the law prior to individual voir dire. Nevertheless, we cannot conceive of any way the trial court's omission could have contributed to the appellant's conviction or punishment and determine beyond a reasonable doubt that it did not. Rule 81(b)(2),

12. Rule 81(b)(2), Tex.R.App.Pro., provides:
 (2) *Criminal Cases.* If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

*Tex.R.App.Pro.*[13]

In appellant's next four points of error he seeks a reversal because the State introduced into evidence at the guilt-innocence stage of the trial two extraneous offenses over his timely objections. The first extraneous matter concerned the testimony of Sally Looper, the substance of which was that James Manuel, a codefendant, had stolen a vehicle from one Cornelio Cisneros on the night of the Merka murder. The Cisnero vehicle was ultimately identified as the one driven by the appellant, damaged and abandoned on Sandy Point Road by the appellant and his companions. The trial court allowed the introduction of the Looper testimony notwithstanding the fact that she was unable to identify the appellant as a participant in the theft of the vehicle. The second extraneous incident deals with the testimony of Barbara Gilmore King, who related on the night of the Merka murder three black men robbed her in a convenience store in Waller, Texas, where she was employed as a night clerk. The evidence indicates that this incident took place sometime after the Merka robbery and murder and, although King could not identify the appellant as a participant in the robbery, somewhat incredibly she was able to state that the shotgun which had previously been identified as one belonging to Merka was the very one used by one of the culprits to execute the robbery.[14]

■ The State counters that both extraneous offenses were admissible as "res gestae" of the offense to show the context in which the criminal act occurred citing *Woolls v. State*, 665 S.W.2d 455, 471 (Tex. Cr.App.1983). We disagree. As to the Looper testimony, it fails to meet the first basic prerequisite necessary to warrant the introduction of an extraneous offense. Simply stated, there was no clear showing that the appellant participated in the extraneous transaction offered by the State

through the testimony of Sally Looper. As was stated in *Phillips v. State*, 659 S.W.2d 415 (Tex.Cr.App.1983):

> In *Albrecht v. State, supra*, it was held that a relationship between evidence of the extraneous transaction and the evidence necessary to prove that the accused committed the crime for which he stands charged must be shown. In *Tomlinson v. State*, 422 S.W.2d 474 (Tex.Cr. App.1968), and again in *Thompson v. State*, 615 S.W.2d 760 (Tex.Cr.App.1981), the rule was explained clearly: even though evidence of an extraneous offense may be relevant to the instant proceeding, such evidence should not be admitted unless the commission of the other crime is clearly proved and the accused is shown to be the perpetrator.

*Id.*, at 418.

In the instant case, the State not only failed to establish that the appellant had knowledge that the Cisnero's vehicle was stolen by Manuel, but that he in any way was a perpetrator of the extraneous offense. This evidence was therefore irrelevant and inadmissible and the trial court committed error by allowing it to be introduced.

■ The evidence of the Waller robbery poses a more difficult question, yet we reach the same conclusion. The State insists that this extraneous transaction was admissible to demonstrate the context of appellant's criminal act. This theory of admissibility was succinctly explained by this Court in *Archer v. State*, 607 S.W.2d 539 (Tex.Cr.App.1980):

> Where an offense is one continuous transaction, or another offense is part of the case on trial or blended or closely interwoven, proof of all such facts is proper. *Welch v. State*, 543 S.W.2d 378, Tex.Cr.App.; *Johnson v. State*, 510 S.W.2d 944, Tex.Cr.App. Such an extra-

---

**13.** We also observe that appellant did not object or make a request that the court comply with Article 35.17(2), *supra*.

. **14.** Over a timely interposed objection, Valerie Rencher also testified that after the murder, she, appellant, Curtis Paul Harris, and James Manu-

el drove to a U–Totem in Waller, Texas, where the three men got out of the pickup truck with the Merka shotgun and returned to the truck after the expiration of five minutes. She stated she had no knowledge as to what happened inside the store.

neous offense is admissible to show the context in which the criminal act occurred; this has been termed the 'res gestae,' under the reasoning that events do not occur in a vacuum and that the jury has a right to hear what occurred immediately prior to and subsequent to the commission of that act so that they may realistically evaluate the evidence. *Albrecht v. State*, 486 S.W.2d 97, Tex.Cr. App.

*Id.*, at 542.

The essence of this exception to the rule against the introduction of extraneous transactions is that these extraneous offenses are so tightly linked with the principle offense that their introduction enables the jury to view the charged offense in its proper setting. *Mann v. State*, 718 S.W.2d 741 (Tex.Cr.App.1986). In other words, the extraneous offense establishes the context of the offense. Integral to this exception, however, is the prerequisite that the extraneous transaction and the offense on trial must be so "blended or closely interwoven" that they constitute "one continuous episode." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex.Cr.App.1986); *Archer v. State, supra; Mitchell v. State*, 650 S.W.2d 801, 811 (Tex.Cr.App.1983).

This case is unlike the factual scenario of *Moreno, supra,* wherein the defendant killed his brother and sister-in-law, Juan and Ester Garza, and during his flight from that crime he killed a State trooper and took several witnesses hostage. On trial for the trooper's murder, this Court sanctioned the State's proof of the extraneous events which occurred half an hour prior to the shooting of the officer and the subsequent events in his continued effort to evade capture. Other than the Garza murders, all of the extraneous events which were admitted into evidence occurred during the escape or flight from the Garza murders and thus were so closely interwoven as to amount to one continuous transaction or episode making it appropriate that

the State show to the jury the entire context of the defendant's conduct. Scrutiny of the instant case reveals that the Waller robbery was completely disassociated from the Merka murder and robbery. Although, according to Rencher, the Merka vehicle was indeed driven to the Waller U–Totem, the State failed to establish a sufficient link between this robbery and the instant offense. The Merka murder and robbery was complete when this extraneous act occurred, and no evidence was admitted showing that the robbery was utilized to evade capture. We can see no acceptable connection between this offense and the Waller offense. The Waller robbery was a separate and independent offense committed for pure profit, and could not aid the jury in understanding the factual context of appellant's other violent, nonsensical conduct. Therefore, the trial court erred in allowing the introduction of the evidence.

Now, we must determine whether the introduction of these two extraneous offenses resulted in reversible error under Rule 81(b)(2), *Tex.R.App.Pro.* In *Mallory v. State*, 752 S.W.2d 566 (Tex.Cr.App.1988), we recognized that Rule 81(b)(2) was the rhetorical and semantic equivalent of the harmless error standard announced by the Supreme Court for constitutional errors in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[15] We went on to observe that the rule is a ternary standard of review in which reversal of a conviction is mandated unless the appellate court concludes beyond a reasonable doubt that the error did not contribute to the conviction or the punishment assessed.

 Although Rule 81(b)(2) has been cited innumerable times by this Court as well as the courts of appeals, beyond simply repeating the language of the rule in conclusory terms, we have failed to articulate a coherent standard for determining when an error is harmless. In other

---

**15.** In his well known *The Riddle of Harmless Error* Roger Traynor observes that the source of the harmless error rule were statutes enacted in England and later in the United States. The essential purpose of the statutes were "to obvi-

ate reversals when an error did not deprive a party of rules or procedures essential to a fair trial." See Traynor, *The Riddle of Harmless Error* (Ohio State University Press: Columbus, Ohio, 1970) p. 14.

words, the harmless error rule is expressed in conclusory terms that implicate subjective concerns. What is absent from the rule is the objective standards that must be explored to reach a legally correct resolution. In this regard it must be emphasized that the function of an appellate court's harmless error analysis is not to determine how the appellate court would have decided the facts, but to determine to what extent, if any, an error contributed to the conviction or the punishment. The language of the rule dictates that a reviewing court's responsibility transcends determining whether the conviction was correct.

In performing a harmless error analysis the easiest and consequently the most convenient approach one could employ is to determine whether the correct result was achieved despite the error.[16] Or, notwithstanding the error, in light of all the admissible evidence was the fact finder's determination of guilt clearly correct? Stated another way, was there overwhelming evidence of guilt that was not tarnished by the error? This approach is incorrect because the language of the rule focuses upon the error and not the remaining evidence. Thus, it logically follows that the inherent difficulty with such an equation is that in applying only that standard the appellate court necessarily envisages what result it would have reached as a trier of fact, thereby effectively substituting itself for the trial court or the jury.

This was made clear four decades ago in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In *Kotteakos* the Supreme Court initially reviewed the historical purpose of the harmless error rule and then acknowledged the obvious: beyond all of the formalistic rhetoric the application of any harmless error rule is basically one of judgment. The Court commented that a harmless error review is not an easy task "because the discrimination it requires is one of judgment transcending confinement by formal or precise rule." *Id.*, at 761, 66 S.Ct. at

1246. The Supreme Court cautioned that "it is not the appellate court's function to determine guilt or innocence ... [N]or is it to speculate upon probable reconviction and decide according to how the speculation comes out." *Id.*, at 763, 66 S.Ct. at 1247. Thus, it is not quite so simple or appropriate to inquire: would the appellant have been convicted in any event?

However, it is absurd to suggest that an appellate court can insulate itself from the reality of the record; thus, it is virtually impossible for the Court to ignore its subjective evaluation of the result below. Consistent with this observation, the Court in *Kotteakos* further commented:

> But this does not mean that the appellate court can escape altogether taking account of the outcome. To weigh the error's effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum.

*Id.*, at 764, 66 S.Ct. at 1247.

This view was repeated in *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), when the Supreme Court stated:

> We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. To decide this question, it is necessary to review the facts of the case and the evidence adduced at trial.

*Id.*, at 88, 84 S.Ct. at 231.

█ As noted, Rule 81(b)(2) mandates that the appellate court focus upon the error and determine whether it contributed to the conviction or the punishment. Irrespective of the focus of the inquiry, it is impossible to gauge the significance of the error apart from the remaining properly admitted evidence. This approach obvious-

---

16. This is commonly referred to as the "overwhelming evidence" test. Under this test one "does not look to the tainted evidence, but to the untainted evidence, and asks whether it alone compels a verdict of guilty." Field, "Assessing the Harmfulness of Federal Constitutional Error—A Process in Need of a Rationale," 125 *Univ. of Penn.L.R.* 15 (1976).

ly implicates a review of the evidence, but the concern is solely to trace the impact of the error. The untainted evidence is not to be weighed in its own right, nor is it to be examined to see if it is cumulative with the tainted evidence; it is to be considered only to uncover the potentially damaging ramification of the error. In other words, the impact of the error cannot be properly evaluated without examining its interaction with the other evidence.

It is important to note that in the context of a harmless error analysis the other evidence is the entire record. Unlike the dictates of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in resolving the issue of the harmfulness of an error an appellate court is obligated to examine the entire record in a neutral, impartial and even-handed manner and not "in the light most favorable to the prosecution...." *Id.*, at 319, 99 S.Ct. at 2789. See *Butler v. State*, 769 S.W.2d 234 (Tex. Cr.App.1989). A review of the evidence in this manner is necessary because, for example, an error can be harmful when it has the effect of disparaging a defense, whereas if there is no defense the error could have been harmless.

▇▇▇ The United States Supreme Court has been as evasive as this Court when it comes to establishing any coherent standards to judge harmless error. As noted, in *Kotteakos v. United States, supra,* and *Fahy v. Connecticut,* supra, the Court condemned the overwhelming evidence standard. In *Chapman v. California, supra,* the Court, citing *Fahy v. Connecticut, supra,* clearly rejected a "correct result" test, particularly if the correct result was to be measured simply by the sufficiency of the evidence to sustain a conviction. However, in *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), the Court arguably departed from its condemnation of the correct result test when it found that improperly admitted confessions were cumulative of other evidence and the untainted evidence against the defendant was overwhelming. This approach continued in *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) and

*Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). In both cases the Supreme Court again claimed that the errors were harmless, despite *Chapman,* by noting that there was overwhelming evidence of guilt. Recently, in *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), in extending the harmless error rule to a violation of one's Sixth Amendment right to cross-examine a witness, the Supreme Court, at least implicitly, applied an overwhelming evidence standard to the error. Similarly, in *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), the Court cited the overwhelming evidence of guilt in determining that improper jury instructions that incorrectly shift the burden of proof to the defendant was an error subject to a harmless error analysis.

For some inexplicable reason this trend seems to have ended with *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). In *Satterwhite* the Supreme Court agreed with this Court that an *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), error is subject to the harmless error rule. However, in reversing the defendant's death sentence the Supreme Court disagreed with this Court's conclusion that Dr. Grigson's tainted testimony was harmless beyond a reasonable doubt. Without citing any case dealing with harmless error, except *Chapman v. California, supra,* the Supreme Court noting the substantial evidence to support the death penalty instead focused upon the impact of Dr. Grigson's testimony and its possible effect upon the jury. The Supreme Court, dispensing with the overwhelming evidence test, at least for the time being, stated:

> The question, however, is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' *Chapman,* 386 U.S., at 24, 87 S.Ct., at 828.

*Id.,* 108 S.Ct. at 1798.

The difficulty in reconciling the various cases applying the harmless error rule,

from *Chapman*, supra, to *Van Arsdall*, supra, does not arise from a changing standard of review, but from changes in the Court's personnel and the relative emphasis that individual justices have placed on relevant considerations of the extent of harm. Such changes should not serve to cast doubt on the process of harmless error analysis. Instead, they are a natural reflection of an inherently subjective process.

> [T]he discrimination it [harmless error analysis] requires is one of judgment transcending confinement by formula or precise rule. That faculty cannot ever be wholly imprisoned in words, much less upon such a criterion as what are only technical, what substantial rights; and what really affects the latter hurtfully. Judgment, the play of impression and conviction along with intelligence, varies with judges and also with circumstance. What may be technical for one is substantial for another; what minor and unimportant in one setting crucial in another.

*Kotteakos*, supra, at 761, 66 S.Ct. at 1246. Thus, the most this Court can do in guiding future harmless error analysis is to state a general formulation of what 81(b)(2) requires, set out general considerations which may be relevant, and trust individual judges to use these observations in their personal calculus.

What can be resolved from all of this rather confusing and at times conflicting authority is that an appellate court should not determine the harmfulness of an error simply by examining whether there exists overwhelming evidence to support the defendant's guilt. The impropriety of this standard is:

> a court that makes a finding of harmlessness under the overwhelming evidence test is not finding that the ... [error] did not in fact affect the verdict.

> . . . . .

The court's affirmance simply indicates its opinion that the untainted evidence is so overwhelming that if the jury had been compelled to rely on it alone, it would have convicted. In so holding, the court is not passing upon what the jury did; it is not determining the propriety of the evidence on which the jury relied. Because it is ruling instead upon what the jury would do if forced to rely on different evidence, it is substituting itself for the jury as factfinder.

Field, "Assessing the Harmfulness of Federal Constitutional Error—A Process in Need of a Rationale," 125 *Univ. of Penn. L.R.* 15, 35 (1976)

 Rather, the appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of the other evidence. As a practical matter, this is a distinction without a difference. In both instances the presence of overwhelming evidence of guilt plays a determinative role in resolving the issue. Nevertheless, in making the analysis the predominant concern must be the error. If the court rules that an error is harmless it is in essence asserting that the nature of the error is such that it could not have affected the jury, so the jury must have relied on overwhelming evidence of guilt in the first place. If overwhelming evidence dissipates the error's effect upon the jury's function in determining the facts so that it did not contribute to the verdict then the error is harmless. Otherwise, it is not.

 In summary, a reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial. Instead, an appellate court should be concerned with the integrity of the process leading to the conviction. Consequently, the court should examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. Further, the court should consider how much weight a juror would probably place upon the error. In addition, the Court must also determine whether declaring the error harmless would encourage the State to repeat it with impunity. In summary, the reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-mak-

ing; it should ask not whether the jury reached the correct result, but rather whether the jurors were able properly to apply law to facts in order to reach a verdict. Consequently, the reviewing court must focus upon the process and not on the result. In other words, a reviewing court must always examine whether the trial was an essentially fair one. If the error was of a magnitude that it disrupted the juror's orderly evaluation of the evidence, no matter how overwhelming it might have been, then the conviction is tainted. Again, it is the effect of the error and not the other evidence that must dictate the reviewing court's judgment.

■ General considerations having been set out, we are left only to provide a skeleton on which to place them. A procedure for reaching this determination should: first, isolate the error and all its effects, using the considerations set out above and any other considerations suggested by the facts of an individual case; and second, ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted.

■ Applying these standards to this case and recognizing that overwhelming evidence can be a factor to be considered, we conclude beyond a reasonable doubt that the introduction of the two extraneous offenses, albeit erroneous, did not contribute to the appellant's conviction or punishment.[17] In addition to the accomplice testimony of Valerie Rencher, the State was able to show that not only was the Merka vehicle found in close proximity to the appellant's residence but several items belonging to Merka were hidden in an area one hundred yards from his home. Appellant was further connected to the homicide by having sold the shotgun belonging to Merka to an individual in the appellant's neighborhood.

In reviewing the record it is apparent that the State was not attempting to taint the trial process in offering as evidence the extraneous offenses. Further, the State made only passing reference to the robbery

in its final argument and made no comment about the car being stolen. In addition, the robbery offense occurred after the appellant killed the deceased so it is not likely that the jury would have considered the latter offense as persuasive evidence that he committed the former. If the sequence of events had been the opposite then an opposite result might be necessary. Be that as it may, the probable impact of this error on the jury was minimal, if any.

■ Appellant raises two concomitant points of error connected with the extraneous offenses. First, appellant contends that the trial court erred when it failed to grant the appellant's motion for mistrial as a result of Looper's testimony on direct examination when she testified that the codefendant, James Manuel, had stolen the Cisnero's vehicle. Appellant interposed the objection that such testimony was opinion and hearsay. The trial court sustained the objection and instructed the jury to disregard. Therefore, any error in the testimony of Looper was cured by the trial court's immediate action in sustaining the objections and instructing the jury to disregard. See, e.g., *Thompson v. State*, 612 S.W.2d 925 (Tex.Cr.App.1981); *Thomas v. State*, 578 S.W.2d 691 (Tex.Cr.App.1979); *Mistrot v. State*, 471 S.W.2d 831 (Tex.Cr.App.1971); *White v. State*, 444 S.W.2d 921 (Tex.Cr.App.1969).

■ As to Barbara King's testimony, appellant complains that it should have been suppressed as the in-court identification was based upon an impermissibly suggestive line-up. This contention is without merit as we have previously determined the harmless nature of the testimony in its entirety. In addition, the record is abundantly clear that King's identification of appellant was totally independent of any pretrial identification procedures which may have occurred. *Turner v. State*, 614 S.W.2d 144, 145 (Tex.Cr.App.1981); *Jackson v. State*, 657 S.W.2d 123, 130 (Tex.Cr.App.1983); *Thompson v. State*, 480 S.W.2d

---

**17.** We observe that the unadjudicated robbery offense would have been properly admissible at the punishment phase of this trial pursuant to Article 37.071(b)(2), V.A.C.C.P.

624, 628 (Tex.Cr.App.1972). Accordingly, this point of error is overruled.

 In his next point of error, appellant contends the trial court erred in not declaring a mistrial because of the testimony of Avis Morgan. According to Morgan, approximately two days after the instant offense he was at the home of co-defendant James Manuel. The appellant was also there sitting on a bed reading the newspaper. Being aware of their commission of the offense, Morgan testified that he told them, "that they were wrong for what they did." The appellant lodged a hearsay objection, which was sustained by the trial court with an instruction to the jury to disregard. Appellant's motion for mistrial was overruled. Without going into the merits of appellant's objection, the error, if any, in the admission of any improper testimony of Avis Morgan was cured by the trial court's prompt action in sustaining the objection and instructing the jury to disregard. *Thompson v. State*, 612 S.W.2d 925 (Tex.Cr.App.1981). Further, this is not an instance where it could be said that the evidence was clearly calculated to inflame the minds of the jury and thus be incurable by the court's curative instruction. *Thompson, id.*, at 928. The error, if any, was therefore cured by the trial court sustaining the objection and in properly instructing the jury. This point of error is overruled.

 At the punishment phase of appellant's trial, the State offered the testimony of two witnesses who were the victims of an aggravated robbery committed by the appellant on July 10, 1978. As his last point of error, appellant asserts that it was error to allow the introduction of such unadjudicated offenses. Such contention is totally without merit. Article 37.071(a), V.A.C.C.P., provides that "evidence may be presented as to any matter that the court deems relevant to sentence" during the punishment phase of a capital murder trial. On numerous occasions this Court has held that this includes evidence of unadjudicated extraneous offenses. *Santana v. State*, 714 S.W.2d 1, 10 (Tex.Cr.App.1986); *Smith v. State*, 683 S.W.2d 393, 405 (Tex.Cr.App. 1984); *Rumbaugh v. State*, 629 S.W.2d 747 (Tex.Cr.App.1982). Without engaging in an elaborate discussion of the authorities, we overrule this point of error.

Accordingly, the judgment of the trial court is affirmed.

BERCHELMANN, J., concurs.

McCORMICK, Presiding Judge, concurring.

Since I am not convinced that the admission of evidence demonstrating extraneous offenses was erroneous, I therefore concur in the judgment of the Court.

CLINTON, Judge, dissenting.

My writing separately is to address intendment of Tex.R.App.Pro. Rule 81(b)(2), to examine mixed notions leading the majority to its *rationes decidendi*, see Maj. at 584–588, against an analysis of germane decisions, and then come to a rational conclusion in the premises.

Tex.R.App.Pro. 81(b)(2) provides:

"If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, *UNLESS the appellate court determines beyond a reasonable doubt that the errors made no contribution to the conviction or to the punishment.*"[1]

Our formulation of language in the "unless clause" of Rule 81(b)(2) was taken practically verbatim from that in *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), as the Supreme Court first isolated and then iterated it in fashioning the rule in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), for determining when "a federal constitutional error can be held harmless." *Id.*, at 24–26, 87 S.Ct., at 828–829, 17 L.Ed.2d, at 710–711.[2]

---

**1.** All emphasis here and throughout is mine unless otherwise noted.

**2.** "... There is little, if any, difference between our statement in *Fahy v. Connecticut* about 'whether there is a reasonable possibility that

To be emphasized at the outset are that our Rule 81(b)(2) is not restricted to assaying "federal constitutional error," nor is it all inclusive; at trial level some "errors" of commission or omission will require reversal either because harm is too speculative to measure or on account of mandatory statute, while other errors may be subject to a specially provided standard of review.[3]

Here, of course, we deal with straightforward application of Rule 81(b)(2) to found errors in admitting evidence of extraneous offenses, so decisions ruling on faults other than trial errors of a kindred kind are not too helpful.[4] Let us go back then to the genesis of the "harmless-constitutional-error rule," namely, *Fahy v. Connecticut.*

The concern in *Fahy* is whether erroneous admission of evidence of fruits of an illegal search and seizure may be, as the state court concluded it was, harmless error. Pretermitting the question of whether such error "can ever be subject to the normal rules of 'harmless' error under the

federal standard of what constitutes harmless error," and without identifying a standard, the Supreme Court preliminarily stated its ultimate finding and summarized its methodology, *viz:*

"... We find that the erroneous submission of this unconstitutionally obtained evidence at this petitioner's trial was prejudicial; therefore, the error was not harmless, and the conviction must be reversed. *We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of.* The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. To decide this, *it is necessary to review the facts of the case and the evidence adduced at trial."*

*Id.,* at 86–87, 84 S.Ct., at 230.[5]

*Fahy* begat *Chapman v. California,* supra. There the prosecutor "took full ad-

---

the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error *to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.* We, therefore, adhere to the meaning of our *Fahy* Case when we hold, as we now do, that before federal constitutional error can be held harmless, *the court must be able to declare a belief that it was harmless beyond a reasonable doubt."*

**3.** See *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, at 1797, 100 L.Ed.2d 284, at 294 (1988); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); *Sorrell v. State,* 74 Tex.Cr.R. 505, 169 S.W. 299, at 303 (1914); an example of the first kind is denial of proper request for jury shuffle pursuant to Article 35.11, V.A.C.C.P., e.g., *Stark v. State,* 657 S.W.2d 115 (Tex.Cr.App.1983), of the latter, error in jury charge under Article 36.19. V.A.C.C.P., e.g., *Almanza v. State,* 686 S.W.2d 157, at 171 (Tex.Cr.App.1985); see *Rose v. State,* 752 S.W.2d 529, at 537, 553 (Tex.Cr.App.1987, 1988).

**4.** The majority looks for lessons in a general conspiracy case the Supreme Court deemed important "for the administration of criminal justice in the federal courts," namely, *Kotteakos v. United States,* 328 U.S. 750, at 752, 66 S.Ct. 1239, at 1241, 90 L.Ed. 1557 (1946).

Given a "variance in proof," the question was whether the conviction was "prejudicial" to petitioners. *Id.,* at 756, 66 S.Ct., at 1243. *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), had held a similar variance is not fatal, based on an understanding of § 269 of the

Judicial Code, providing that an appellate court render judgment "without regard to *technical* errors, defects or exceptions which do not affect the substantial rights of the parties." *Id.,* at 757, 66 S.Ct., at 1244. That section became 28 U.S.C. § 2111, and a shorter version also appears in Fed.R.Crim.Pro. 52(a).

*Kotteakos* is inapposite. It does not even purport to discuss testing constitutional error. Every statement alluded to and quoted in the majority opinion, at 585, 586–587, comes from that part of the decision finding *Berger* not controlling. *Id.,* at 757–766, 66 S.Ct., at 1244–1248. None of it was utilized in *Fahy v. Connecticut,* see 375 U.S. at 86, 84 S.Ct., at 230, and the rule was used in *Chapman v. California* only to contrast "small errors or defects" unlikely to change result of trial. 386 U.S., at 22, 87 S.Ct. at 827, 17 L.Ed.2d., at 709.

**5.** At first blush the underscored statements may seem to be at odds, but the caution is that sufficiency of evidence is not a relevant factor in an analysis to determine "the effect of this [forbidden] evidence upon the other evidence adduced at trial and upon the conduct of the defense" (and concomitantly its influence on the factfinder). *Id.,* at 87, 84 S.Ct. at 231.

Thus in making its review, and finding admission of the illegally obtained evidence in this particular case was clearly prejudicial, Supreme Court noted that the erroneously admitted tangible evidence was "itself incriminating," that it bolstered certain incriminating testimony of an investigating peace officer as to presence of

vantage of his right under the State Constitution to comment on [accuseds'] failure to testify, filling his argument to the jury from beginning to end with numerous references to their silence and inferences of their guilt resulting therefrom;" also the trial court charged the jury that "it could draw adverse inferences from petitioners' failure to testify." Id., at 19, 87 S.Ct., at 825, 17 L.Ed.2d, at 707–708.

For purposes of fashioning "a harmless-constitutional-error rule," the Supreme Court equated, for example, "highly important and persuasive evidence, or argument, [which] though legally forbidden, finds its way into a trial;" it noticed similarity in both the federal and California statutory rules, but that California courts had emphasized a court's view of "overwhelming evidence." However, the Supreme Court expressed its preference for the approach taken by it "in deciding what was harmless error" in *Fahy v. Connecticut,* supra, *viz:*

> "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."

*Chapman,* at 22–23, 87 S.Ct., at 827, 17 L.Ed.2d, at 710. Then discussing implications of *Fahy* the Supreme Court pointedly observed: "An error in admitting plainly relevant evidence which possibly influenced the jury cannot, under *Fahy,* be conceived of as harmless." Id., at 23–24, 87 S.Ct., at 828, 17 L.Ed.2d, at 710. Further, it made

clear that the burden to show such was harmless falls on "the beneficiary of that error;" adhering to "the meaning of our *Fahy* Case," the Supreme Court concluded its formulation of the new rule with the holding set out in note 2, *ante,* at 589–590.

In quickly applying its holding the Supreme Court believed content, tenor and extent of the comments "impressed the jury that from the failure of petitioners to testify, to all intents of purposes, the inferences from the facts in evidence had to be drawn in favor of the State;" that though there was a reasonably strong "circumstantial web of evidence," without "the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts."

> "Under these circumstances, it is completely impossible for us to say that the State has demonstrated, beyond a reasonable doubt, that the prosecutor's comments and the trial judge's instruction did not contribute to petitioners' convictions. Such a machine-gun repetition of denial of constitutional rights, designed and calculated to make petitioners' version of the evidence worthless, can no more be considered harmless than the introduction against a defendant of a coerced confession. Petitioners are entitled to a trial free of unconstitutional inferences."

Id., at 25–26, 87 S.Ct., at 829, 17 L.Ed.2d, at 711.[6]

---

defendant near the crime scene and finding similar tangible evidence in his possession, making the testimony "far more damaging than it otherwise would have been." Id., at 88–89, 84 S.Ct., at 231. Moreover, the tangible evidence based an opinion of yet another peace officer matching it with manifestations of the offense, thereby "forging another link between the accused and the crime charged," the prejudicial effect being obvious. Id., at 89, 84 S.Ct., at 231. Also, accused was precluded by trial court from pursuing a challenge of admissibility of certain admissions and a later confession made by him following his arrest because of the state of exclusionary rule at the time, but "he should have had a chance to show his admissions were induced by being confronted with the illegally obtained evidence." Id., at 91, 84 S.Ct., at 232. Finally, the Supreme Court considered "the cumulative effect of this evidence upon the conduct of the defense at trial," in that he was

moved to take the stand, admit the acts, and then contend those acts were not condemned by the statute. *Ibid.*

**6.** Fast on the heels of *Chapman v. California* came several similar brief decisions involving claims of erroneous admission of evidence or comment on failure to testify which without additional edification either vacated or reversed the judgment below, *viz: Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Anderson v. Nelson,* 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968); *Fontaine v. California,* 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); see also *Miller v. California,* 392 U.S. 616, 88 S.Ct. 2258, 20 L.Ed.2d 1332 (1968) (Justice Marshall dissenting).

Others dealt with jury instructions, e.g., *Burgett v. Texas,* 389 U.S. 109, 88 S.Ct. 258, 19

Two years after *Chapman v. California* and its followings collected in note 6, *ante,* the Supreme Court decided *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), with an opinion the majority here says "arguably departed from its condemnation of the correct result test" and looked instead for "overwhelming evidence of guilt." Slip opinion at 586. Of course, in writing the opinion Justice Douglas stoutly rejected that argument, *viz:*

> "We do not depart from *Chapman;* nor do we dilute it by inference. We reaffirm it. We do not suggest that, if evidence bearing on all the ingredients of the crime is tendered, the use of cumulative evidence, though tainted, is 'harmless error.' Our decision is based on the evidence in this record. The case against Harrington was not woven from circumstantial evidence."

*Id.,* at 254, 89 S.Ct., at 1728–1729, 23 L.Ed.2d, at 288. Those disclaimers invite examination, particularly since the majority reads *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), and *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), to subscribe to a so called "overwhelming evidence" exercise. But read *Delaware v. Van Arsdall,* 475 U.S. 673, at 684, 106 S.Ct. 1431, at 1438, 89 L.Ed.2d 674, at 686–687 (1986), for "correct inquiry" and five factors "included" in harm analysis for *Davis v. Alaska* error.

Essential facts of the case are the following: Harrington and three codefendants were tried together for attempted robbery and felony murder; confessions of each codefendant were admitted in evidence with limiting instructions to consider each confession only against the confessor; one codefendant testified adversely to Harring-

ton and was crossexamined by his attorney; the other two did not testify. Thus constitutional error was violation of the *Bruton* rule.[7]

After reviewing the evidence adduced and concluding *"on these special facts"* that lack of opportunity to crossexamine the two confessors constituted "harmless error under the rule of *Chapman,"* Justice Douglas reprised that the testifying codefendant, as had victims of attempted robbery, placed Harrington in the store with a gun at the time of the murder; in his own statement Harrington had admitted he was present. The two nontestifying confessors placed him at the scene of the crime but did not put a gun in his hand; their evidence was characterized by Justice Douglas as "cumulative." *Id.,* at 251–254, 89 S.Ct., at 1727–1729, 23 L.Ed.2d, at 286–287.

Rather than attempting to imagine that a single juror might have accepted the two confessions and remained in doubt and unconvinced of guilt, because judges "do not know the jurors who sat," the Court took a more judicious approach, *viz:*

> "... Our judgment must be based on our own reading of the record and on what seems to us to have been the *probable impact* of the two confessions on the minds of an average jury. We admonished in *Chapman* ... against giving too much emphasis to 'overwhelming evidence' of guilt, stating that constitutional errors affecting the substantial rights of the aggrieved party could not be considered to be harmless. By that test we cannot impute *reversible weight* to the two confessions."

*Id.,* at 254, 89 S.Ct., at 1728, 23 L.Ed.2d, at 288. That is to do just what the Court did in *Fahy* and *Chapman:* examine the character, quality and effect of tainted evidence

L.Ed.2d 319 (1967), and *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). See also *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), and *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987). While adhering to the *Chapman* standard, in cases of this kind the Supreme Court conducts an analysis without regard to the erroneous instruction *on* an element to determine whether the jury was precluded from considering that element and the facts necessarily found

by the jury establish guilt beyond a reasonable doubt. *Pope v. Illinois,* supra, at 502–503, 107 S.Ct., at 1922, 95 L.Ed.2d, at 447.

7. See *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (denial of rights under Confrontation Clause of Sixth Amendment made applicable to states through Due Process Clause of Fourteenth by *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)).

(or impermissible comments) against other evidence adduced at trial to determine whether the tainted material might have so influenced the jury that there is a reasonable probability it contributed to the conviction. *Fahy*, at 86–87, 84 S.Ct., at 230; *Chapman*, at 23–24, 26, 87 S.Ct., at 828–829, 17 L.Ed.2d, at 710–711.[8]

Read in those lights, *Fahy*, *Chapman* and *Harrington* and indeed *Delaware v. Van Arsdall*, supra, refute the notion that the Supreme Court ever started a "trend" toward a true single "overwhelming evidence of guilt" standard for assaying harmless error, as identified by the majority opinion at 30, n. 16, and at 35. Certainly, the Supreme Court discerned no such trend last year when it came to review *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), to determine whether it was harmless error to introduce psychiatric testimony obtained in violation of the Sixth Amendment right to consult with counsel, *id.*, at 254, 108 S.Ct., at 1796, 100 L.Ed.2d, at 290, and to examine that decision of singular significance to our own jurisprudence I now turn.

In finding the *Estelle v. Smith* error harmless the majority in *Satterwhite v. State*, 726 S.W.2d 81 (Tex.Cr.App.1986), introduced its analysis with the observation that "Dr. Grigson's testimony was not the only evidence offered by the State during the punishment phase of the trial," *id*, at 93. It then proceeded to summarize all testimony presented by the State on punishment and to editorialize the offense; it alluded to testimony of Dr. Grigson only in noting testimony of a psychologist was "very similar" to his "conclusions about appellant;" that the State bolstered his testimony in argument was not mentioned. *Ibid.*; cf. dissenting opinion, at 95–96. Fol-

lowing the analysis made in *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980), the majority found the constitutional error harmless, *viz:*

> "We conclude that the properly admitted evidence was such that the minds of an average jury would have found the State's case *sufficient* on the issue of the 'probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society' *even if Dr. Grigson's testimony had not been admitted.*"

*Id.*, at 93. And in n. 5, at 93–94, it distinguished denial of effective counsel on account of conflicting interests in that: "The error in the present case, while just as improper, related only to Dr. Grigson's testimony, rather than to the proceeding as a whole."

The Supreme Court found that methodology fatally deficient because it addresses the wrong question, *viz:*

> "... The question, however, is not whether the legally admitted evidence was *sufficient* to support the death sentence, *which we assume it was*, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained did not contribute to the verdict obtained.' *Chapman*, 396 U.S., at 24, 87 S.Ct. 824, [at 828] 17 L.Ed.2d 705."

*Id.*, at 258, 108 S.Ct., at 1798, 100 L.Ed.2d, at 295.

Reminiscent of *Fahy*, Justice O'Connor recounted evidence presented, *id.*, at 258–259, 108 S.Ct., at 1798–1799, 100 L.Ed.2d, at 295–296, and examined "the impact of this evidence [from Dr. Grigson] upon the other evidence adduced." *Fahy*, 375 U.S. at 87, 84 S.Ct., at 231.[9]

**8.** *Schneble v. Florida,* supra, like *Harrington,* is a *Bruton* violation, and at 430–432, 92 S.Ct., at 1059–1060, for the majority (Chief) Justice Rehnquist closely tracks the analysis previously made by Justice Douglas in *Harrington.* Three months later and also following *Harrington,* in *Milton v. Wainwright,* supra, Chief Justice Burger, obviously distressed by yet another collateral attack on a fourteen year old conviction, gave Milton such short shrift that Justice Stewart and three others protested his turning the back of the Supreme Court on a forty year old land-

mark constitutional precedent "[u]nder the guise of finding 'harmless error.'" *Id.,* at 378, 92 S.Ct., at 2178, 33 L.Ed.2d, at 7.

**9.** Earlier the Court had agreed that "the Sixth Amendment notice requirement set out in *Estelle v. Smith* was not met[,]" *id.*, at 254, 108 S.Ct., at 1796, 100 L.Ed.2d, at 292–293; Justice Marshall directly noted effects such violation could have "upon the conduct of the defense," *Fahy, ibid,* and was convinced that allowing the testimony "may never be considered harmless

As with the "constitutionally forbidden comments" in *Chapman,* and whether to "impute reversible weight to the two confessions" in *Harrington,* after pointing out that "the finding of future dangerousness was critical to the death sentence," and that "Dr. Grigson was the only psychiatrist to testify on this issue, and the prosecution placed significant weight on his powerful and unequivocal testimony," the Court concluded:

"... Having reviewed the evidence in this case, we find it impossible to say beyond a reasonable doubt that Dr. Grigson's expert testimony on the issue of Satterwhite's future dangerousness *did not influence the sentencing jury.*"

*Id.,* at 260, 108 S.Ct., at 1799, 100 L.Ed., at 296.

Where there is error in proceedings below, the intendment of Tex.R.App.Pro. Rule 81(b)(2) is to mandate reversal unless it can be held "beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment." In context of error in admitting evidence, as in the instant cause, the beneficiary is required "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* at 24, 87 S.Ct., at 828, 17 L.Ed.2d, at 711. And before that error can be held harmless, an appellate court "must be able to declare a belief that it was harmless beyond a reasonable doubt." *Ibid.*

Germane decisions reviewed *ante* not only lay down the rules but also demonstrate the methodology for analyzing facts of, and evidence adduced in, a given case in order to determine beyond a reasonable doubt that an error in admitting evidence (or allowing prosecutorial comment) made no contribution to the conviction or to the punishment. Since formulated in *Fahy,* restated and explicated in *Chapman* and perpetuated in *Harrington,* followed by repetitive precedential construction and application, rules and methodology have developed

into an identifiable narrow body of appellate law, most recently updated in *Satterwhite.* They are certainly much more definitive and protective against inadmissible evidence than the basic tenet grasped by the majority at 587, "considerations" suggested at 587–588, and whether the State tried "to taint the trial process," at 588.

Adapting settled methodology to resolve our Rule 81(b)(2) formulation, the ultimate inquiry may be simply stated: Is it impossible to say beyond a reasonable doubt that the extraneous offenses did *not* influence the jury adversely to appellant on the issue of guilt or punishment? *Satterwhite* and *Chapman.*

Evidence that may have influenced a jury surely contributes to its verdict. Every piece and sheaf of evidence is submitted for whatever consideration a jury may give it, unless restricted by a limiting instruction. Therefore, our first step is to separate and collect on one side evidence erroneously admitted ("tainted"), and on the other that remaining evidence presented by the prosecution. Our next step is to examine the character and quality of the "tainted" evidence as it relates to the other, not for relative volume but its effect on the "untainted" evidence.[10] We also look to its effect on conduct of the defense and to any other adverse ramifications. That done, we then make "an intelligent judgment about whether the erroneous admission of ["tainted" evidence] might have affected [an average rational] jury." *Satterwhite v. Texas,* supra, 486 U.S. at 258, 108 S.Ct. at 1798, 100 L.Ed.2d at 295. Compare *Van Arsdall,* supra.

In the instant cause our ultimate concern is with "tainted" evidence of two extraneous offenses. That kind of evidence is "inherently prejudicial, tends to confuse the issues in the case, and forces the accused to defend himself against charges which he had not been notified would be

error," *Satterwhite,* at 263–264, 108 S.Ct., at 1801–1802, 100 L.Ed.2d, at 299–300.

**10.** In conducting this examination, while we can assume that the latter is sufficient to sustain the

verdict, nevertheless it may have some inherent weakness—for example, testimony from an immunized or accomplice witness—that in fairness should be taken into consideration.

brought against him." *Albrecht v. State*, 486 S.W.2d 97, at 100 (Tex.Cr.App.1972). Over related objections from appellant, the trial court admitted that evidence apparently on a theory that they are "res gestae" of the primary offense, and thus the trial court did not give any restrictive instruction limiting consideration of them by the jury.

Furthermore, the principal prosecution witness was Valerie Rencher, fifteen year old girlfriend of Curtis Harris, appellant's brother, whose testimony and attitude were scrutinized by this Court in *Harris v. State*, 645 S.W.2d 447 (Tex.Cr.App.1983). There we examined in detail the testimony of Rencher and other evidence, including "a 'deal' with the State that in exchange for her testimony the State would recommend she receive no more than a ten year sentence if she were tried as an adult," to find that "the trial court erred in failing to submit to the jury the question of whether Rencher was an accomplice witness." *Id.*, at 454–458. Substantially the same testimony and evidence, including documentary formalization of that "deal," were introduced to the jury in the instant cause. Accordingly, the trial court gave the jury the usual instructions for determining whether Rencher was an accomplice witness and, if so, for considering her testimony. Since her testimony "formed virtually the State's entire case against appellant,"

*id.*, at 457, her status as an accomplice witness was a central issue at trial.[11]

Essentially the theory of the prosecution was that appellant was criminally responsible as a conspirator and that Rencher was not an accomplice, but if the jury believed she was then her testimony had been corroborated.[12] Thus another issue was raised. Let us review testimony describing the two extraneous offenses and attendant circumstances in juxtaposition with related evidence, principally testimony from Rencher, and prosecution argument linking circumstances of the extraneous offenses to guilt of appellant.

As to the extraneous offense first in time, Sally Looper testified that on December 11, 1978, around seven o'clock in the evening, she watched James Manuel, nicknamed "Dirty Red," who she knew as a former schoolmate, together with a black man, who she did not know or otherwise identify, walk in front of her car, cross a street, approach a convenience store, get in a Ford Torino belonging to a male neighbor of hers who was then inside a telephone booth; the motor of the Torino was already running, and without contacting him "they just took off in the car." She identified State's Exhibit 20 as a photograph of the "yellow orange car." Looper reported the incident to the police and received a five hundred dollar reward for her information.[13]

---

**11.** "Testimony of an accomplice witness is untrustworthy and should be received and viewed with caution." *Eckert v. State*, 623 S.W.2d 359, at 361 (1981). "Because such a witness is usually deemed to be corrupt, his testimony is always looked upon with suspicion." *Holladay v. State*, 709 S.W.2d 194, at 196 (Tex.Cr.App.1986).

**12.** Rencher raised a pivotal question on conspiracy by her testimony that before the victim was attacked, she heard appellant whisper to his brother, " 'We're going to drive this man,' or something to that effect." (76 S.F. 98). She put it in a larger context *viz:*

"Appellant and Manuel came out from behind the car and approached Rencher and Curtis Harris, appellant in the lead. Manuel, stopping near the car's left door, said to appellant, 'Man, my arm is still out of place.' Appellant walked up to Curtis Harris and Rencher. With Rencher standing between the two of them appellant whispered, 'We're going to drive this man.' (sic)."

*Harris v. State*, supra, at 455. Intendment or precise meaning of that latter remark was the subject of speculation during trial (77 S.F. 175–177) (Rencher did not know what that meant at the time—"he didn't give any indication that he wanted his brother to hurt that man" that she knew—and was "only guessing that [she knows] what that meant now"), and in argument (82 S.F. 93), and is still being interpreted in briefs of the parties.

That after the first lick Rencher was "getting ready to ... get in the truck" (76 S.F. 103) when she told Curtis Harris not to hit the victim any more suggests that she took the remark in a vernacular familiar to her to mean, "We're going to drive this [pickup truck], man."

**13.** On the evening of December 11, 1978 at approximately 7:00 p.m., appellant and Manuel arrived at the Harris residence in a "gold" Ford Torino being driven by appellant. Among others present was Rencher; testifying as an alleged accomplice witness, she identified the

After preliminary felicitous remarks, an assistant district attorney told the jury that he would "just briefly go over a few key pieces of evidence and I ask the jury to keep in mind these things[.] [L]et me touch on some of what I consider to be elements of this case." He began immediately with the testimony of Sally Looper, *ante*, at 595, including, *viz:*

> "... There was another black male with Dirty Red and she doesn't know who it was, she didn't get good look at him.... But I submit to you that this is a very critical piece of evidence because Sally Looper puts Dirty Red, James Manuel with that Ford Torino."

That and other "key pieces of evidence" identified, he argued, were corroborative of some related particular in Rencher's testimony. In closing argument for the State the district attorney rejected the notion advanced by counsel for appellant that Looper was lying because she got five hundred dollars, emphasizing her clear identification of James "Dirty Red" Manuel.[14]

Concerning the second extraneous offense, Barbara Gilmore King testified that she was alone working at a U–Totem store in Waller when three black men came in "a little after eleven o'clock" on the night of December 11, 1978; in court, one male she identified from a photograph as Manuel was carrying a shotgun that appeared to be the same shown in a photograph of the shotgun belonging to deceased, and another male she testified she "believed" to be appellant. Two of them approached the checkout counter, one stood across the counter, another moved behind the counter next to her; appellant remained by the front door. They left in a few minutes.[15]

First assistant district attorney recalled that King "put James Manuel in that U–Totem, with two other black males. And points to this defendant in the courtroom and says that looks like him." Rhetorically, he added:

> "... I don't think there is any doubt in your mind that those three black males were together that night. Curtis Harris, Danny Harris and James Manuel."

In response to the argument of counsel for appellant that King said "she could not identify Danny Harris as being in there, but they're wanting you to say we've got this woman that says Danny Harris was there," the district attorney conceded King said, "I can't be sure, can't be positive ... [b]ut I think he's the one, his eyes are the same. Words to that effect. It was James

---

Ford Torino as the vehicle pictured in State's Exhibit 20. Rencher recounted the illfated odyssey appellant, James Manuel, Curtis Harris and she then began in the Ford Torino, moved to the killing on Sandy Point Road, continued in the GMC pickup of deceased to Waller and back to Bryan where it ended for her and Curtis Harris at the Harris house. See *Harris v. State,* supra, at 454–456, a "comprehensive factual recitation" adopted by the majority in its opinion at 572.

Brazos County Sheriff Bobby Yeager investigated the primary offense and at the scene inspected the damaged "mustard colored Ford Torino" portrayed in State's Exhibit 20.

14. Given the facts that Looper could not say whether Manuel or the black male got behind the wheel and drove the Ford Torino away, and that when it arrived shortly thereafter at the Harris residence appellant was driving, the jury could reasonably infer that appellant was the party who actually acquired and exercised control over the Torino.

15. Although the trial court excluded testimony of Looper that she was robbed, Rencher had already told the jury that as they were preparing to leave the scene of the primary offense in the GMC pickup, Manuel had acquired the wallet of deceased and when he got in the pickup he said, "[T]his man had keys [sic, probably "kids"], but he's broke." While appellant was driving away Manuel declared that "we needed some money;" on the floorboard was a gun case from which Manuel removed a shotgun. After they went to the Harris house where appellant and Curtis Harris changed clothes, the quartet headed toward Houston. Along about Navasota Manuel tossed out drivers license of deceased and other items later recovered. When they got to Waller appellant drove the pickup about a block off the highway and pulled up behind the convenience store; leaving the motor running, they left the pickup with the shotgun and entered the store. In about five minutes they returned to the pickup, and appellant drove to the highway, turned toward Bryan and fled away at speeds of "maybe ninety" miles per hour.

Back in Bryan, near the Harris house appellant stopped the pickup in some woods and "they started throwing away a lot of stuff they had got and they split up the money." Rencher received an unspecified amount.

Manuel who she was sure of and there was a third black male down there, but you didn't hear her say there was a black female in there ... no, just those three." However, he added:

"... Valerie told you she stayed out in the truck, while they left that truck with the shotgun, they parked behind the U– Totem down there, about eleven o'clock that night, Barbara Gilmore says they were in there about eleven fifteen to eleven thirty. About the same time."

Manifestly the prosecution valued highly the two extraneous offenses and circumstances surrounding them: the facts that the Ford Torino had been stolen by "Dirty Red" Manuel and appellant early in the evening and, after killing the deceased, that they and Curtis Harris ranged as far as Waller to commit aggravated robbery of King and return to Bryan later that night.

The facts attending the first extraneous offense were themselves "incriminating," thereby "forging another link between the accused and the offense charged." The second one as well forged more connecting links. *Fahy,* supra, at n. 5, *ante.*

We cannot determine from the general verdict whether the jury believed and found Rencher to be an accomplice, but having reviewed the evidence in this cause, in my judgment it is impossible to say beyond a reasonable doubt that evidence of two extraneous offenses bracketing the primary offense did not influence the jury in finding a verdict of guilty and in making affirmative answers to special issues, particularly number two. The majority opines at 38 that "probable impact" on the jury of erroneously admitted evidence was "minimal," but if it served to "influence" the jury, those errors cannot be harmless.

Accordingly, I would reverse the judgment and remand the cause to the trial court. Therefore, I respectfully dissent.

TEAGUE, Judge, dissenting.

I respectfully file this dissenting opinion.

This Court itself has formulated a rule that dictates when an appellate court must reverse after finding error occurred during the defendant's trial. "If the appellate record in a criminal case reveals error in the proceedings below, the appellate court *shall* reverse the judgment under review." (My emphasis.) Rule 81(b)(2), Rules of Appellate Procedure. The only exception to this rather harshly written rule of appellate procedure provides that if the beneficiary of the error, the State, can convince the appellate court beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment that was assessed, then the cause should not be reversed because of the error that was committed. Simply because the State cannot use the testimony of the only individuals, the members of the jury, who can furnish the answer to the question, whether beyond a reasonable doubt the error made no contribution to their verdict of guilt or punishment, logically at least the State is destined to lose every single case in which non-federal "Chapman v. California" type constitutional law error or state error in the charge is found to exist by an appellate court of this State. This is a very harsh rule, but it is the rule that this Court itself has approved. Until the rule is modified or changed, it is the rule that should be invoked and applied to all non-federal "Chapman v. California" type constitutional law trial errors, and state errors in the court's charge. This rule governs any type of error that occurs "in the proceedings below." One court made exception to this rule concerns state error in the court's charge, which kind of error is controlled by this Court's decision of *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1985).

Rule 50(e), Rules of Appellate Procedure, governs the effect of a failure to comply with a timely request from the defendant for a statement of facts. Where a timely request has been made, and the court reporter has lost his or her notes without fault on the part of the defendant, the "appellant is entitled to a new trial unless the parties agree on a statement of facts." Given the wording of the rule, which is also another harshly written rule of appellate procedure, I am confident that there is not a criminal defense attorney in this State who would ever agree to a proposed state-

ment of facts, no matter how accurate same might be. See also *post.*

In this instance, I especially dissent to the majority opinion's holding that, notwithstanding that the record on appeal in this cause is incomplete, appellant is not entitled to a new trial under this Court's decision of *Dunn v. State,* 733 S.W.2d 212 (Tex.Cr.App.1987), which held that once an appellant shows that he had timely and properly requested the court reporter to take notes of the trial, or any part thereof, no matter how insignificant the notes might be to resolving issues on appeal, if, through no fault of his, the court reporter fails to transcribe the notes, he is entitled to a new trial. I also especially dissent to the majority opinion's holding that although the trial judge at the guilt stage of the trial erred in admitting into evidence over objection testimony that related to two extraneous offenses, under Rule 81(b)(2), such error was harmless to appellant.

As to the missing transcript, the majority opinion attempts to distinguish *Dunn* on the following basis: "In the cases cited in *Dunn,* id., the missing portions of the record were either the entire statement of facts, the final argument, or an essential portion of the trial. In the case at bar, the missing portion of the record is a transcription of the notes of a pretrial hearing that are not essential or even applicable to a resolution of this appeal." (Page 575 of majority opinion.) The majority opinion also attempts to distinguish *Dunn* on the basis that because the trial judge "transcribed" what *he* remembered occurring at the hearing, *his* supplemental transcript cured any error of omission.

With one exception, *Fine v. State,* 68 S.W.2d 192 (Tex.Cr.App.1934), every single case that the majority opinion cites and discusses to support its second conclusion should easily make it clear to almost anyone that those cases involved the situation where this Court approved the substitution of an *original* court document, such as an information or an indictment, *with an exact copy* of that document. Authority for doing this was former Art. 44.11, V.A.C.

C.P. Now see Rule 50(e), Rules of Appellate Procedure. Thus, given this Court's past interpretation of former Art. 40.09(7), V.A.C.C.P., the majority opinion's reliance on that statute, to hold that the act of the trial judge in this cause, in creating, not an exact copy of the transcription, but a transcription of what *he* remembered from the hearing, amounted to nothing less than substituting *his* transcription for the transcription of the original notes that do not now exist.

It is true that this Court held in *Fine* that it was permissible for the trial court to hold a hearing on just exactly what the jury was instructed, i.e., what the trial court's charge to the jury actually stated, and that the trial judge could resolve any conflicts in the testimony. A newly "created" copy of the charge that the trial judge had given was then included in the record on appeal. This Court rejected the defendant's contention that it was necessary for the substituted charge to be in the exact language of the lost charge, and held: "We think the law requires no more than that *the charge* be substantially the same as the instruction shown to be lost." (My emphasis.) However, my research to date has not revealed a single case of this Court that has reaffirmed its holding in *Fine.* Thus, *Fine,* if not strictly limited, appears to be an aberration in our law.

Assuming, however, that *Fine* is "good" law, as to reconstruction of *a jury charge,* it will not support the majority opinion's holding that a trial judge is permitted to transcribe what he remembers occurring, and then substitute same as a copy of a court reporter's lost notes. In this instance, appellant did not agree to the trial judge's transcription. If the majority opinion's holding was logical, which it is not, then we could dispense with court reporters transcribing statements of facts and just turn that task over to our trial judges and let them put in statement of facts form whatever they remembered occurring in the proceedings below. This Court, however, has never approved such a holding.

In fact, implicit in what this Court held in *Bradley v. State,* 564 S.W.2d 727, 732–734

(Tex.Cr.App.1978), is the holding that if the appellant who has timely requested a statement of facts will not agree to an agreed statement of facts, and the court reporter's notes have been forever lost, the appellant must be granted a new trial. And that is the principle of law that I thought this Court reaffirmed in *Dunn,* which has been such solid authority that this Court within the last year reversed a death penalty case in a per curiam unpublished opinion because a complete transcription of the court reporter's notes could not be had because the court reporter lost his notes in that cause. See *Richardson v. State,* 752 S.W.2d 579 (Tex.Cr.App.1988).

I say to the majority: There is only one way to get around *Dunn,* and that is to expressly overrule it. Attempting to explain it away or to haphazardly distinguish it, or to even engraft exceptions on it, will simply not get the job done.

Today, an exception is created for an obviously negligent court reporter who was not the regular court reporter assigned to the trial court. What will be the next exception that this Court will create for another negligent court reporter who cannot keep track of his or her notes? However, just because there might be a few court reporters out there who are negligent by not keeping track of their notes should not cause or justify this Court in this cause to create an exception to the rule laid down in *Dunn.*

Although *Dunn* provides a rather harsh remedy for the negligent act of a court reporter, by losing his or her notes, I believe that by creating an exception to *Dunn,* as the majority opinion does, we reward rather than punish the negligent act of the court reporter that occurred in this cause. I will, of course, continue to have faith that, with few exceptions, court reporters of this State who report criminal cases will continue to perform in accordance with the high standards of that very necessary and noble profession. I believe that this Court does a disservice to those hardworking and conscientious court reporters who do not lose their notes by excusing the negligent acts of those few court reporters who exist within that group. We should not create an exception to a good rule just so a few negligent court reporters will be excused for their negligence, which is what I find that the majority opinion actually does in this cause.

I further dissent to the majority opinion's holding that although the trial judge erred in admitting into evidence over objection at the guilt stage of the trial two extraneous offenses, such error was harmless under Rule 81(b)(2), Rules of Appellate Procedure.

If one carefully reads what the majority opinion states about how it interprets and applies Rule 81(b)(2), he should easily conclude as I have that the majority opinion's "bottom line holding" is simply that the errors that occurred would not have affected its author and those who join his opinion—had they served on this jury. But they cannot conclusively say, beyond a reasonable doubt, that the errors did not have any impact on all of the jurors who served on this jury. As previously pointed out, strange as it may sound, the only individuals who can furnish us with the answer are not permitted to inform us whether the errors made no contribution to their decision finding appellant guilty or in answering the special issues submitted to them at the punishment stage of the trial. Those individuals are the members of the jury. Because I am unable to agree that either the State or this Court's majority opinion has established beyond a reasonable doubt that the errors made no contribution to the jury's verdict of guilt in this cause, or that same did not contribute to the jury's answering the submitted special issues in the affirmative, my vote is to reverse this conviction on this point as well as the above point. Also see the cases collated in Vol. 18, *Texas Criminal Digest,* under Criminal Law Key No. 1169.11, and the dissenting opinions that I filed in *Black v. State,* 723 S.W.2d 674 (Tex.Cr.App.1986), and *Beathard v. State,* 767 S.W.2d 423 (Tex.Cr.App. 1989).

To the majority opinion's contrary holdings, I am compelled to dissent.

## 600

DISSENTING OPINION ON APPEL-
LANT'S MOTION FOR REHEARING

CLINTON, Judge.

Now that the Court has reexamined the genesis and tracked antecedents of Rule 81(b)(2) in *Arnold et al. v. State*, 784 S.W.2d 372 (Tex.Cr.App.1990), and denied motions for rehearing in those causes, I would grant rehearing here to reconsider our initial effort "to articulate a coherent standard for determining when an error is harmless" under Rule 81(b)(2), opinion, at 584, to the end that conceptual nuances may be reconciled for benefit of the bench and bar. Because the majority does not, I respectfully dissent.

My dissent is in two parts: first, a modified version of a portion of the opinion of the Court along the lines of its basic views and going with the flow of its "formulation" but revising format and editing content, from the last paragraph on page 584 to first one on page 588; second, an application of the first.

### I

Although Rule 81(b)(2) has been cited many times, we have yet to articulate a coherent standard for determining when an error is harmless. The problem is that the rule is expressed in conclusory terms that may be read to admit subjective concerns rather than objective standards which must be explored to reach a legally correct resolution. In this regard it must be emphasized that the function of a harmless error analysis is not to determine how an appellate judge would have decided the facts, but to determine whether an error contributed to the conviction or the punishment. The purpose of the rule dictates that appellate responsibility transcends deciding whether the conviction was correct. See *Traynor*, supra n. 15, at 35–36.

In performing a harmless error analysis the easiest and consequently the most convenient approach one could employ is to determine whether the correct result was achieved despite the error.[16] Or, notwithstanding the error, in light of all the admissible evidence was the fact finder's determination of guilt clearly correct? Stated another way, is there "overwhelming evidence" of guilt that was not tarnished by the error? This approach is incorrect because the language of the rule focuses upon the error and not the remaining evidence, and to review and weigh only "untainted" evidence makes an appellate court the *factfinder*, effectively substituting itself for the trier of fact.

The rule is derived from a passage in *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). Reviewing a state's determination of harmless error to admit evidence gathered in an illegal search and seizure, and finding that "the erroneous submission of this unconstitutionally obtained evidence ... was prejudicial [and] therefore, the error was not harmless," the Supreme Court outlined the correct approach.

> We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. To decide this question, it is necessary to review the facts of the case and the evidence adduced at trial.

*Id.*, at 88, 84 S.Ct. at 231.[17]

As noted, Rule 81(b)(2) mandates that the appellate court focus upon the error and

---

**16.** This is commonly referred to as the "overwhelming evidence" test. Under this test one "does not look to the tainted evidence, but to the untainted evidence, and asks whether it alone compels a verdict of guilty." Field, "Assessing the Harmfulness of Federal Constitutional Error—A Process in Need of a Rationale," 125 *Univ. of Penn.L.R.* 15 (1976).

**17.** The *Fahy* analysis is reminiscent of a detailed exposition in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946),

construing federal "harmless error statute" in a general conspiracy case.

The statute commanded federal appellate courts in both civil and criminal cases to "give judgment after an examination of the entire record ... without regard to technical errors, defects or exceptions which do not affect the substantial rights of the parties." *Id.*, at 757, 66 S.Ct. at 1244. Noting legislative history that the statute "affects only technical errors," but if "its natural effect is to prejudice a litigant's substantial rights, the burden of sustaining a verdict

determine whether it contributed to the conviction or the punishment. Irrespective of the focus of the inquiry, it is impossible to gauge the significance of the error apart from the remaining properly admitted evidence. This approach obviously implicates a review of the evidence, but the concern is solely to trace the impact of the error. The untainted evidence is not to be weighed in its own right, nor is it to be examined to see if it is cumulative with the tainted evidence; it is to be considered only to uncover the potentially damaging ramifica-tion of the error. In other words, the impact of the error cannot be properly evaluated without examining its interaction with the other evidence.[18]

Those lessons are in *Kotteakos* and *Fahy*, and *Chapman* retaught them, also rejecting an "overwhelming evidence" standard. *Chapman v. California*, at 23, 87 S.Ct. at 827. Yet in *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1967), arguably the Supreme Court departed from their teachings when

will ... rest upon the one who claims under it," the Supreme Court observed:

> Easier was the command to make than it has been always to observe. This, in part because it is general; but in part also because the discrimination it requires is one of judgment transcending confinement by formula or precise rule. [citation omitted]. * * * * Judgment, the play of impression and conviction along with intelligence, varies with judges and also with circumstance. What may be technical for one is substantial for another; what minor and unimportant in one setting crucial in another.
>
> \* \* \* \* \* \*
>
> In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of stare decisis by what has been done in similar situations. [citation omitted]. Necessarily the character of the proceeding, what is at stake upon its outcome, and the relation of the error asserted to casting the balance for decision on the case as a whole, are material factors in judgment.

*Id.,* at 761–762, 66 S.Ct. at 1246.

In light of a congressional "fear of too easy relaxation of historic securities thrown around the citizen charged with crime," *id.,* at 762, 66 S.Ct. at 1246, the Supreme Court found help in the matter of making judgments in criminal causes.

> Some aids to right judgment may be stated more safely in negative than in affirmative form. Thus, it is not the appellate court's function to determine guilt or innocence. [citations omitted throughout]. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them sole criteria for reversal or affirmance. Those judgments are exclusively for the jury....
>
> But this does not mean that the appellate court can escape altogether taking account of the outcome. To weigh the error's effect against the entire setting the record without relation to the verdict or judgment would be almost to work in a vacuum. In criminal causes that outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.
>
> This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record.
>
> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress.... The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.,* at 763–765, 66 S.Ct. at 1247–48.

**18.** It is important to note that in the context of a harmless error analysis the other evidence is the entire record. Unlike the dictates of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in resolving the issue of harmfulness of an error an appellate court is obligated to examine the entire record in a neutral, impartial and even-handed manner and not "in the light most favorable to the prosecution...." *Id.,* at 319, 99 S.Ct. at 2789. See *Butler v. State*, 769 S.W.2d 234 (Tex.Cr.App.1989). A review of the evidence in this manner is necessary because, for example, an error can be harmful when it has the effect of disparaging a defense, whereas if there is no defense the error could have been harmless, at least in that respect.

it found that, apart from "cumulative evidence" in erroneously admitted confessions, "the case against Harrington was so overwhelming that this violation of Bruton was harmless beyond a reasonable doubt." *Id.*, at 254, 89 S.Ct. at 1728. However, speaking through Justice Douglas, the Court made clear that its decision was on "these special facts," *id.*, at 253, 89 S.Ct. at 1728; that by the test of *Chapman* it could not "impute reversible weight to the two confessions," *id.*, at 254, 89 S.Ct. at 1728; that "[w]e do not depart from Chapman; nor do we dilute it. We reaffirm it," *ibid.;* that it did not suggest "if evidence bearing on all ingredients of the crime is tendered, the use of cumulative evidence, though tainted, is harmless," *ibid.*, that its decision "is based on the evidence in this record [which] is so overwhelming that unless we say that no violation of Bruton can constitute harmless error [the conviction must be affirmed]," *ibid.*

In *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the majority read all that to mean that where properly admitted evidence of guilt is overwhelming and prejudicial effect of codefendants' statements is insignificant by comparison, Bruton error is harmless, *id.*, at 430, 92 S.Ct. at 1059, 31 L.Ed.2d at 344, and following such analysis it found insufficient prejudicial effect of inadmissible evidence of codefendant in light of defendant's own confession; Justice Douglas, interestingly enough, was among the dissenters. *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), involved a claimed violation of the Sixth Amendment under *Massiah* in that an officer pretending to be a fellow inmate testified to certain incriminating statements made by defendant; the majority found the error harmless because defendant himself had made three full confessions to other officers; again, however, Justice Douglas joined dissenters. More recently, in *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Supreme Court extended the rule to denial of Sixth Amendment right to crossexamine a prosecution witness about bias, included among five factors to be considered "over-

all strength" of prosecution's case, and remanded the cause to state court to make a harmless error determination in the first instance. Contemporaneously, in *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), the Court decided that *Sandstrom* error is subject to a harmless error analysis and an instruction erroneously shifting the burden on malicious intent may be harmless, not on account of "overwhelming evidence" but because the charge still required the jury to find existence of those facts; it likewise remanded to the state court to make that determination. See *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1988), adhering to *Chapman* test and applying it to erroneous instruction on an element of offense by ascertaining whether jury was precluded from considering that element and facts jury must have found show guilt beyond reasonable doubt; see also *Carella v. California*, 491 U.S. ——, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (Justice Scalia dissenting) (mode of analysis may depend upon nature of error, e.g., certain jury instructions, even when evidence of guilt is overwhelming, *id.*, 109 S.Ct. at 2421–2422).

Thus in the course of extending the *Chapman* standard to more and more kinds of constitutional errors, the Supreme Court is finding it cannot be applied like a bright line rule. Relevant considerations vary from problem to problem, and "overwhelming evidence" may resolve one yet have no bearing on solving another. In *Harrington*, Justice Douglas himself read *Chapman* to admonish "against giving too much emphasis to 'overwhelming evidence' of guilt," 395 U.S., at 254, 89 S.Ct. at 1728, and other cases have practically ignored that circumstance.

In *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), the Supreme Court agreed with this Court that an *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), error is subject to the harmless error rule. However, in reversing the sentence of death the Supreme Court disagreed with the conclusion that tainted testimony by Dr. Grigson was harmless beyond a reasonable doubt.

Without citing any case dealing with harmless error, except *Chapman v. California*, supra, the Supreme Court noted substantial evidence to support the death penalty but focused on the impact of his testimony and its possible effect on the jury. Without undertaking to determine whether evidence was "overwhelming," the Court stated:

> The question, however, is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' *Chapman*, 386 U.S., at 24, 87 S.Ct., at 828.

*Id.*, 108 S.Ct. at 1798.

Any perceived difficulty in reconciling various cases applying the harmless error rule from *Chapman* to *Van Arsdall* and *Pope v. Illinois*, all supra, is not occasioned by a changing standard of review, but from a failure to recognize that the manner of making an analysis of the facts of the case—not of the offense—will vary according to the error in question.[19]

Thus the most this Court can do to guide prospective harmless error analyses is to provide a formulation of requisites under Rule 81(b)(2), present general considerations that may be relevant, and trust judges to use these observations in assaying what the error meant to other men and women reacting with reason.

An appellate court must not determine harmfulness of an error simply by examining whether there exists "overwhelming evidence" to support a finding of guilt. The impropriety of this standard has been explained:

> a court that makes a finding of harmlessness under the overwhelming evidence test is not finding that the ... [error] did not in fact affect the verdict.

· · · · ·

> The court's affirmance simply indicates its opinion that the untainted evidence is so overwhelming that if the jury had been compelled to rely on it alone, it would have convicted. In so holding, the court is not passing upon what the jury did; it is not determining the propriety of the evidence on which the jury relied. Because it is ruling instead upon what the jury would do if forced to rely on different evidence, it is substituting itself for the jury as factfinder.

Field, "Assessing the Harmfulness of Federal Constitutional Error—A Process in Need of a Rationale," 125 *Univ. of Penn. L.R.* 15, 35 (1976).

Rather, the appellate court should calculate as best it can probable impact of the error on jurors in light of other evidence; "overwhelming evidence" may or may not play a role, depending on the particular error and the facts of the case and evidence adduced. The predominant concern must be the error and its likely impact. When the court rules that an error is harmless in

---

**19.** To suggest that any such difficulty follows "from changes in the Court's personnel and the relative emphasis that individual justices have placed on relevant considerations of the extent of harm [that] are a natural reflection of an inherently subjective process" is to misread the Court, to confuse the process. In *Kotteakos*, supra, at 761, 66 S.Ct. at 1246, the Court did introduce its discussion of proper exercise of judicial judgment with observations that "the play of impression and conviction along with intelligence, varies with judges and also with circumstance [and that] [w]hat may be technical for one is substantial with another; what minor and unimportant in one setting crucial in another." However, the Court went on to develop considerations involved in the process, and ultimately to reject the notion that it is "inherently subjective," *viz:*

... And the question is not were [jurors] right in their judgment regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, *not on one's own*, in the total setting. [citations omitted].

This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions *not by his own*, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record.

*Id.*, at 764, 66 S.Ct. at 1247.

essence it has found the nature of the error is such that it could not have affected jurors, so the jury must have relied on other evidence. When properly considered overwhelming evidence so dissipates a probable impact on minds of jurors reacting with reason, the error did not contribute to the verdict of guilt, and is harmless. Otherwise, it is not.

In summary, applying the harmless error rule, a reviewing court should not focus on propriety of outcome of trial. Instead, an appellate court should be concerned with impact of the thing done wrong, to determine whether the error might have affected deliberations of the jury. Accordingly, it must identify the source of the error, discern the nature of the error, examine the extent to which it was emphasized by the prosecution, estimate its gravity, and consider its probable consequences. The court is to assume evidence is sufficient to support the verdict, and not be distracted by assaying its weight; concentration must be on the error to judge whether it possibly influenced the jury. Again, it is the impact of the error, not other evidence, that must dictate whether the court can say beyond reasonable doubt that error made no contribution to the verdict.

With those general considerations identified, we now provide a skeleton on which to place them. The methodology is, first, to isolate the error and its effects in light of foregoing considerations and any others suggested by the facts of the particular case and, second, to judge whether the error and its effects might have influenced the minds of rational jurors in reaching their verdict. The Court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman,* at 24, 87 S.Ct. at 828; *Satterwhite,* 486 U.S. at 258, 108 S.Ct., at 1798.

### II

Of course, for reasons developed in my dissent on original submission, I do not agree with the application of these standards the majority would make to the facts of this cause. That testimony of the teenage accomplice was corroborated, as indeed

it must be for evidence to be sufficient, does not constitute "overwhelming evidence." Even if discernible in the record, that "the State was not attempting to taint the trial process" and only made "passing reference" to them says nothing about impact of two extraneous felony offenses on minds of jurors. That it was "minimal" is still enough to influence the jury.

Accordingly, I would grant appellant's motion for rehearing.