Byrd v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-95-235-CR

        JEFFREY DEWAYNE BYRD,
                                                                              Appellant
        v.

        THE STATE OF TEXAS,
                                                                              Appellee
 

From the 54th District Court
McLennan County, Texas
Trial Court # 95-78-C
                                                                                                    

O P I N I O N
                                                                                                    

          A jury found the appellant, Jeffrey Dewayne Byrd, guilty of murder and assessed
punishment at life imprisonment in the Texas Department of Criminal Justice - Institutional
Division and a $5000 fine. Tex. Penal Code Ann. § 19.02 (Vernon 1994). Byrd raises six
points on appeal: (1) the trial court erred during voir dire in permitting the State to suggest to the
venire panel that a jury must be able to articulate a reason to not find proof beyond a reasonable
doubt; (2) the State failed to give timely notice of its intention to use extraneous offense evidence
at punishment; (3) the trial court erred in entitling the jury charge, "First Main Charge of the
Court"; (4) the trial court erred in listing the "guilty" option on the verdict form prior to the "not
guilty" option; (5) the trial court erred in allowing into evidence a police officer-made chart that
impermissibly synthesized evidence that the jury was able to synthesize by itself; and (6) the trial
court erred in allowing into evidence one of Byrd's penitentiary packets during the punishment
phase because it incorrectly indicated that he had been sent to the penitentiary for an offense for
which he, in reality, received a probated sentence. We affirm the portion of the judgment
concerning Byrd's guilt, but we reverse the portion concerning the determination of punishment
and remand for a new punishment hearing.
          The record reveals that Byrd and two companions, travelling on foot, flagged down the
victim and his friend as they were driving by. The victim, thinking the men were going to let him
know of some mechanical problem with his vehicle, exited the car and, after speaking briefly to
Byrd, began to fight with him near the rear of the vehicle. After a few punches had been thrown
by both men, the victim moved back to the driver's-side door of the vehicle and got in. Byrd
followed him around the car and shot at him multiple times, killing him and injuring the victim's
friend.
          In his first point of error Byrd complains the trial court erred in permitting the State to
misstate the law on its burden of proof. The relevant portion of the record is printed as follows:
[State]: Now, the thing is the law, the definition says that proof beyond a
reasonable doubt therefore must be proof of such a convincing character that you
would be willing to rel[y] and act on it without hesitation in the most important of
your own affairs. It is the kind of doubt that would make a reasonable person
hesitate to act in the most important of his own affairs. Now, what are we talking
about, we talk about hesitation to act. You know all of us know that juries
deliberate cases, and sometimes they deliberate cases for hours, and sometimes if
it has been a long case, and it has gone on, and sometimes jury deliberations takes
several days. That is not the kind of hesitation we are talking about. We are not
talking about jury deliberation. We are talking about after the jury has gotten back
there, deliberated and thought about the case, then the individual members say here
is some reason that I feel like that I shouldn't vote guilty on it. I hesitate to vote
guilty, for this reason.
 
[Defense]: I object, your Honor, the jury doesn't have to specify a particular
reason in the juror's mind, they can just believe that the case was not proved
beyond a reasonable doubt. They don't have to specify a reason.
 
COURT: Overrule the objection. I do instruct the jury that they will have to
believe beyond a reasonable doubt before they can convict him.
 
[State]: That is fine. Thank you, Judge, I appreciate it.

Byrd contends the State's comment misstated the law on the burden of proof insofar as a jury need
not be able to cite any specific reason for its conclusion that the State did not present sufficient
proof to warrant a conviction. We conclude that the State did not misstate the law.
          In examining the above-quoted portion of the State's voir dire, we note that the State began
with a correct general statement of the law on the State's burden of proof: "[P]roof beyond a
reasonable doubt therefore must be proof of such a convincing character that you would be willing
to rel[y] and act on it without hesitation in the most important of your own affairs." See Geesa
v. State, 820 S.W.2d 154, 162 (Tex. Crim. App. 1991) ("Proof beyond a reasonable doubt,
therefore, must be proof of such a convincing character that you would be willing to rely and act
upon it without hesitation in the most important of your own affairs."). Looking at the formula
from another angle, the State then informed the venire what "reasonable doubt" means in the
context of the State's burden of proof: "It is the kind of doubt that would make a reasonable person
hesitate to act in the most important of his own affairs." Id. ("A 'reasonable doubt' is a doubt
based on reason and common sense after a careful and impartial consideration of all the evidence
in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most
important of his own affairs."). The State then suggested an instance when a juror might find that
the State's evidence was insufficient to establish proof beyond a reasonable doubt: When the juror
can articulate a reason why he believes a reasonable doubt exists in the case.
          We agree with Byrd that a jury is not required to articulate a specific reason to find that
the State did not meet its burden of proof. Nevertheless, one instance in which the jury might find
that the State failed to meet its burden is when the jury can specifically identify a reason for why
it believes a reasonable doubt exists in the case. This is the instance that the State utilized in
trying to illustrate to the venire the concept of hesitation in relation to the State's burden of proof. 
If Byrd was concerned that the venire was left with an erroneous understanding of the State's
burden of proof after hearing the State's voir dire, Byrd was free then to question the venire
members about whether they believed they needed to have a specific articulable reason for finding
reasonable doubt in a case. The State did not misstate the law in using this instance in trying to
explain the concept of hesitation. Byrd's first point is without merit, and it is overruled.
          Byrd in his third point complains that the trial court erred in entitling the jury charge,
"First Main Charge of the Court." He asserts that the title impliedly informed the jury that a
second charge would be given to them only if they found Byrd guilty. Therefore, contends Byrd,
by calling the charge at guilt-innocence the "First Charge," the jury was led to believe by the
charge that Byrd was guilty because the court was prepared to issue a second charge. In his fourth
point, Byrd alleges that the trial court also erred in listing the "guilty" option before the "not
guilty" one on the verdict sheet. He alleges this also constituted a comment on the weight of the
evidence as well as an infringement upon his presumption of innocence. Byrd cites no authority
for either of these arguments; therefore, his third and fourth points are overruled. Tex. R. App.
P. 74(f); Garcia v. State, 919 S.W.2d 370, 390 (Tex. Crim. App. 1996) (on rehearing).
          In his fifth point Byrd argues that the trial court erred in allowing State's Exhibit Number
18 into evidence. Exhibit 18 was a chart made by Waco Police Officer James Blair that indicated
the purported trajectories of the bullets that passed through the victim's car. The chart showed
four bullets being fired into the car from a common point of origin a few feet away from the closed
driver's-side door. The chart identified the bullets by the numbers 3, 4, 5, and 6. Bullets 3 and
4 were shown to have been fired into the driver's-side door. Bullet 5 was shown to have been shot
through the inside compartment of the car and through the open passenger-door on the other side
of the car. And bullet 6 was shown to have passed through a small portion of the inside
compartment on the passenger-side before exiting the vehicle.
          Byrd makes two arguments against the admission of the chart: (1) the chart was the result
of pure speculation about the trajectories of the bullets by Officer Blair; and (2) Officer Blair was
not presented to the trial court as an expert witness and, therefore, should not have been allowed
to present this expert testimony. We disagree with both contentions.
          Officer Blair did not draw his chart based upon speculative evidence. Immediately before
the State offered the chart into evidence, the State admitted into evidence without objection a
number of photographs. Exhibit numbers 6 and 7 showed the bullet holes made in the driver's-side door by bullet numbers 3 and 4, respectively. Exhibit number 8 showed the hole in the inside
of the passenger-side door made by bullet number 5. Exhibit number 9 showed the hole in the
outside of passenger-side door made by bullet number 5. And exhibit 10 showed the entrance and
exit holes made in the passenger seat and passenger seatbelt housing made by bullet number 6.
          After introducing into evidence exhibit numbers 6 through 10, the State then offered
exhibits 13 through 17. These five photographs again showed the bullet holes, but this time a
straight metal rod was inserted through the entrance and exit points of each of the holes. Exhibit
17 related to bullet number 3. Exhibit 14 related to bullet number 4. Exhibits 15 and 16 related
to bullet number 5. And exhibit number 13 related to bullet number 6. We note that, in relation
to each of the photographs, the entrance and exit points of the bullet holes are not the same; in
other words, there is some distance between the entrance point and exit point for each of the bullet
holes.
          In proving-up the admissibility of the chart, Officer Blair testified that he followed the
continued direction of each the rods from each of the holes and determined that the lines all
intersected at a single point a few feet from the driver's-side door. Based upon this observation,
Officer Blair drafted his chart.
          First, we conclude that the chart was not based upon speculative evidence. Officer Blair
identified the bullet holes in the victim's car and ran metal rods through the entrance and exit
points for each of the holes. He then followed the line indicated by the rods to determine a
common point of origin for each of the bullets. The lines that Officer Blair drew on the chart were
determined by the position of the rods through the holes, and the positions of the rods were
determined by the holes. Therefore, we can only conclude that there was no speculation at all on
the part of Officer Blair in drafting his chart. The evidence upon which he relied was fixed and
determined.
          Second, we conclude that the chart did not represent or reflect any expert testimony on the
part of Officer Blair. The chart was simply a re-demonstration of the position of the bullet holes
in the victim's car. It would have been extremely difficult for the jury to reconfigure the position
of the bullet holes in its collective mind to determine the origin of the bullets. Officer Blair's chart
recast the evidence already made apparent to the jury by the admitted photographs in a different
form without any additional or incidental comment on the weight of that evidence. Therefore, we
conclude that Officer Blair's chart did not constitute expert testimony. Byrd's fifth point of error
is overruled.



          Byrd argues in his second point of error that the trial court erred in allowing the State to
introduce evidence of extraneous offenses at the punishment phase of the trial even though the
State had not given adequate notice according to Tex. R. Crim. Evid. 404(b) and Tex. Crim.
Proc. Code Ann. art. 37.07, § 3(g) (Vernon Supp. 1996).
          The record reveals that Byrd was indicted on January 25, 1995. On March 10, 1995, Byrd
requested notice from the State of its intention to use extraneous offenses either during the guilt-innocence or punishment phases of the trial. On Friday, June 9, 1995, the State tendered notice
to Byrd of its intention to use eleven different extraneous offenses. Voir dire in Byrd's trial began
the following Monday, June 12, and the parties made their opening statements the next day, on
June 13.
          The State argues that Byrd waived his complaint with regard to eight of the eleven listed
extraneous offenses because in his objection he referred to only the first three. The statement of
facts, however, clearly indicates that Byrd made his objection to all eleven of the listed extraneous
offenses. The State's preservation-of-error argument is without merit.
          The State also argues that Byrd's point is multifarious because he complains of both
unreasonable notice and his attorney's consequent inability to render effective assistance of counsel
because of the unreasonable notice. The point is not multifarious: his two complaints are
essentially the same. Therefore, we will consider the point of error. Hernandez v. State, 914
S.W.2d 226, 234 (Tex. App.—Waco, no pet.).
          As an initial matter, we note that Byrd may not contend that he was prejudiced by the
admission of all eleven of the listed extraneous offenses. The following is the list of the
extraneous offenses given to Byrd by the State: 
(1) Possession of a short-barrelled firearm on or about November 10, 1994;
 
(2) Felon in possession of a firearm on or about October 31, 1994;
 
(3) Unauthorized use of a motor vehicle owned by Philip Mistretta on or about July
26, 1993; 
 
(4) Conviction on or about July 26, 1993, for evading arrest;
 
(5) Aggravated assault against Gerald Dwight Hicks on or about March 29, 1990,
and his subsequent conviction for assault;
 
(6) Conviction for terroristic threats against Katherine and Linda Anderson on or
about August 27, 1993;
 
(7) Conviction for threatening to shoot Lisa Johnson on or about October 15, 1994;
 
(8) Conviction for evading detention on or about October 23, 1992;
 
(9) Conviction for unlawfully carrying a weapon on or about May 18, 1994;
 
(10) Conviction for theft of over $20 and under $200 on May 18, 1994; and
 
(11) Conviction for unauthorized use of a motor vehicle.

          The record indicates that three of the eleven offenses became apparent to the jury during
guilt-innocence when Byrd admitted on cross-examination that in December 1991 he had been
convicted of felonious unauthorized use of a motor vehicle (extraneous offense numbers 2 and 11)
and that he had also been convicted of misdemeanor theft (extraneous offense number 10). Byrd
allowed the State to cross-examine him about these offenses without objection and without a
request for any limiting instruction. Therefore, the jury was free to consider the evidence of these
extraneous offenses for all purposes notwithstanding any lack of reasonable notice by the State. 
Garcia v. State, 887 S.W.2d 862, 878-79 (Tex. Crim. App. 1994), cert. denied, — U.S. —, 115
S.Ct. 1368 (1995).
          Furthermore, our review of the record reveals that the State did not offer any evidence of
extraneous offenses 3, 4, and 7.


 Therefore, we will only consider whether error resulted from
the State's admission of extraneous offenses 1, 5, 6, 8, and 9 at the punishment phase.
          This court in Hernandez held that notice on Friday of the State's intent to use extraneous
offenses at a trial to begin the following Monday was not reasonable notice under Rule 404(b). 
914 S.W.2d at 234-35. Notwithstanding our holding in Hernandez, the State contends that its
notice was nevertheless reasonable because it did not use the extraneous offenses until the
punishment phase of the trial which began on June 19, ten days after it tendered its notice.
          The record indicates that Byrd's trial lasted the entire week of June 12-16, 1995. In
Hernandez we identified that the purpose of the notice requirement under Rule 404(b) was "to
allow the defendant adequate time to prepare for the State's introduction of the extraneous offenses
at trial." Id. (citing Self v. State, 860 S.W.2d 261, 264 (Tex. App.—Fort Worth 1993, pet.
ref'd)).


 Byrd could not have spent this week preparing for the State's introduction of the
extraneous offense evidence at punishment while he was tending to the guilt-innocence phase of
his trial. At the most, Byrd's counsel, but not Byrd, himself, had an extra weekend after the jury
reached a verdict on guilt-innocence on June 16 to prepare for the extraneous offense evidence. 
This extra weekend clearly was not sufficient enough to render the State's notice reasonable under
our reasoning in Hernandez.
          We will now turn to a harm analysis under Tex. R. App. P. 81(b)(2), which provides that,
when there is error, "the appellate court shall reverse the judgment under review, unless the
appellate court determines beyond a reasonable doubt that the error made no contribution to the
conviction or to the punishment." In performing a harmless error analysis, we isolate the error
and its effects and then ask whether a rational trier of fact might have reached a different result
if the error and its effects had not resulted. Hernandez, 914 S.W.2d at 235. Factors to be
considered in the analysis are: (1) the source of the error; (2) the nature of the error; (3) whether
or to what extent it was emphasized by the State; (4) its probable collateral implications; (5) how
much weight a juror would probably place upon the error; and (6) whether declaring the error
harmless would encourage the State to repeat it with impunity. Harris v. State, 790 S.W.2d 568,
587 (Tex. Crim. App. 1989). 
          We cannot conclude beyond a reasonable doubt that the admission of extraneous offenses
1, 5, 6, 8, and 9 made no contribution to Byrd's punishment. We will look at the several Harris
factors.
          The source of the error was court records of convictions for extraneous offenses 5, 6, 8,
and 9, and a police officer's testimony in extraneous offense 1. The source of the evidence was
very reliable and, consequently, very damaging to the defense.
          The emphasis the State put on the extraneous offense evidence was great. Aside from the
testimony of three Waco police officers that Byrd's reputation in the community for being a
peaceful and law-abiding citizen was bad, the only evidence the State offered at punishment was
the extraneous offenses.
          The nature of the error was that Byrd was essentially a dangerous and villainous person
who ought to be put away for as long as possible. We appreciate that the seriousness of the
offense was also great, but we cannot conclude that extraneous offenses 1, 5, 6, 8, and 9 had no
effect on the jury's determination of how serious it actually was. Other than the extraneous
offenses and the testimony by the three Waco police officers concerning Byrd's reputation in the
community, the jury had no idea of Byrd's violent history until the extraneous offense evidence
came in. Byrd did admit during guilt-innocence that he was a felon at the time of the offense, but
he only admitted to the unauthorized use of a motor vehicle and misdemeanor theft, not to any
violent offenses. Only when the other extraneous offenses were admitted at punishment did the
jury learn that Byrd had possessed a sawed-off shotgun and that he had also been convicted of
aggravated assault, terroristic threats, and the unlawful carrying of a weapon.
          Based upon the previous discussion, we also conclude that the collateral implications of
extraneous offenses 1, 5, 6, 8, and 9 were wide-reaching and that the jury probably put a great
amount of emphasis on the evidence is assessing punishment. We note, however, that the State,
as in Hernandez, probably acted in good faith in trying to admit the extraneous offense evidence
and, therefore, the error is not likely to be repeated. 914 S.W.2d at 238. Byrd's second point is
sustained.
          We affirm the portion of the judgment relating to Byrd's guilt, but we reverse the portion
relating to punishment and remand for a new punishment hearing. Due to our disposition of
Byrd's second point, we need not consider his sixth.



                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Justice Cummings,
         Justice Vance, and
         Chief Justice McDonald (Retired)
Affirmed in part, reversed and remanded in part
Opinion delivered and filed September 18, 1996
Do not publish